IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2000 Session

**DWIGHT SADDLER v. LEONARD SADDLER, ET AL.**

**Direct Appeal from the General Sessions Court Probate Division for Wilson County
Robert P. Hamilton, Judge**

---

**No. M1999-01258-COA-R3-CV - Filed July 27, 2000**

---

This appeal arises from a dispute between Plaintiff Dwight Saddler and Defendants Leonard and Paula Saddler regarding the ownership of a piece of real property in the estate of Edwina Groom Saddler known as the Hancock Farm. The trial court awarded this property to Dwight Saddler, finding that he is the owner of the property as the beneficiary of a resulting trust. Because we agree that Dwight Saddler has proven with the required degree of certainty that the Hancock Farm is the subject of a resulting trust in his favor, we affirm the ruling of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Probate
Division Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

David B. Foutch, Lebanon, Tennessee, for the appellants, Leonard Saddler and Paula Saddler.

Betty Lou Taylor, Lebanon, Tennessee, for the appellee, Dwight Saddler.

**OPINION**

Dwight, Leonard, and Paula Saddler are the adult children of the late John T. and Edwina Groom Saddler. Prior to their deaths, John T. and Edwina Groom Saddler owned and operated a farm, which consisted of three separate pieces of real property known as the Allen Farm, the Fite Farm, and the Hancock Farm. They sold the Fite Farm in either 1974 or 1975. John T. Saddler died in November of 1985, at which time Edwina Groom Saddler became the sole owner of the Allen Farm and Hancock Farm. On December 16, 1986, Edwina Groom Saddler executed a last will and testament providing that "[a]fter the payment of my aforesaid debts and funeral expenses, I hereby give, devise, and bequeath unto my children, DWIGHT G. SADDLER, LEONARD A. SADDLER, and PAULA E. SADDLER, all of my property, real, personal, and mixed, and wherever situated, to be theirs in equal shares." Two days later on December 18, 1986, she executed a holographic codicil stating that "[i]f Dwight still wants the farm Leonard and Paula help him all you can for him to own it in his and his son's name." Edwina Groom Saddler died in May of 1997. In July of 1997, her last will and testament and holographic codicil were admitted to probate. Dwight Saddler subsequently

filed a complaint with the probate court asking the court to declare that the holographic codicil devised the Hancock Farm solely to him or, in the alternative, that he is the owner of the Hancock Farm as the beneficiary of a resulting trust. Additionally, Dwight Saddler filed a claim against the estate of Edwina Groom Saddler in the amount of $980,701.62. Leonard and Paula Saddler filed an exception to this claim. After a hearing on all of these matters, the probate court sustained the exception to Dwight Saddler's claim but nevertheless declared that he is the owner of the Hancock Farm as the beneficiary of a resulting trust. This appeal by Leonard and Paula Saddler followed.

The issues raised by the parties on appeal, as we perceive them, are as follows:

I.     Did the trial court err in ruling that Dwight Saddler is the owner of the Hancock Farm as the beneficiary of a resulting trust?

II.    If the trial court did incorrectly rule that Dwight Saddler is the owner of the Hancock Farm as the beneficiary of a resulting trust, did the court further err in sustaining Leonard and Paula Saddler's exception to the claim that Dwight Saddler filed against the estate of Edwina Groom Saddler?

To the extent that these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness and thus we may not reverse the court's factual findings unless they are contrary to the preponderance of the evidence. *See, e.g., Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996); T.R.A.P. 13(d). With respect to the court's legal conclusions, however, our review is *de novo* with no presumption of correctness. *See, e.g., Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); T.R.A.P. 13(d).

In *In re Estate of Nichols*, 856 S.W.2d 397 (Tenn. 1993), the Tennessee Supreme Court summarized the law of resulting trusts as follows:

> The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

> While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another – sometimes referred to as a "purchase-money resulting trust"– they may also

be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust – on an inquiry into the consideration of a transaction – in order to prevent a failure of justice. However, the particular circumstances under which a resulting trust may arise varies from jurisdiction to jurisdiction.

*Id.* at 401 (quoting 76 Am. Jur. 2d *Trusts* § 166 (1992)). A resulting trust may be proven, and is typically proven, by parol evidence. *See Roach v. Renfro*, 989 S.W.2d 335, 340 (Tenn. Ct. App. 1998); *Smalling v. Terrell*, 943 S.W.2d 397, 400 (Tenn. Ct. App. 1996); *Myers v. Myers*, 891 S.W.2d 216, 219 (Tenn. Ct. App. 1994); *Rowlett v. Guthrie*, 867 S.W.2d 732, 735 (Tenn. Ct. App. 1993); *St. Clair v. Evans*, 857 S.W.2d 49, 51 (Tenn. Ct. App. 1993). When a party seeks to prove the existence of a resulting trust by parol evidence, however, the level of proof required is more than a mere preponderance of the evidence. *See Roach*, 989 S.W.2d at 340; *Smalling*, 943 S.W.2d at 401; *St. Clair*, 857 S.W.2d at 51. In such a case, the proof of a resulting trust must be of the clearest, most convincing, and irrefragable character. *See King v. Warren*, 680 S.W.2d 459, 461 (Tenn. 1984); *Roach*, 989 S.W.2d at 340; *Smalling*, 943 S.W.2d at 401; *St. Clair*, 857 S.W.2d at 51; *Bowman v. Bowman*, 836 S.W.2d 563, 570 (Tenn. Ct. App. 1991). The testimony of a single, interested witness typically is insufficient to establish a resulting trust by clear, convincing, and irrefragable evidence. *See King*, 680 S.W.2d at 461; *Tansil v. Tansil*, 673 S.W.2d 131, 133 (Tenn. 1984); *St. Clair*, 857 S.W.2d at 51. When the parol evidence of a resulting trust is in conflict with the terms of a written instrument, it is not essential that the evidence remove all reasonable doubt, but it must be so clear, cogent, and convincing that it overcomes the evidence to the contrary and the presumption that exists in favor of the terms of the written instrument. *See Smalling*, 943 S.W.2d at 401; *Myers*, 891 S.W.2d at 220; *Rowlett*, 867 S.W.2d at 735.

In support of his position that the Hancock Farm is subject to a resulting trust in his favor, Dwight Saddler contends the he had an oral agreement with his parents (John T. and Edwina Groom Saddler) providing that, in exchange for his work on the farm and assistance in paying off the farm debt, he would receive the Hancock farm upon their deaths. With respect to this alleged agreement, Dwight Saddler testified (1) that, in February of 1968, he was drafted into the army and subsequently qualified for the army's helicopter pilot training program, which would require him to enlist in the service for an additional two years, (2) that, when he telephoned his parents to tell them about the program, his father informed him that he (John T. Saddler) was in financial difficulty and that the farm was in danger of foreclosure, (3) that his father proposed that, if he (Dwight Saddler) was willing to return to the farm as soon as possible, then upon the deaths of both of his parents, he would receive the Hancock Farm, (4) that, after agreeing to this proposal, he was sent to Vietnam, (5) that, during his service in the military, his mother sent letters to him approximately two or three times per week, many of which made reference to the aforementioned agreement, (6) that, toward the end of his tour in Vietnam, he was given the option of shortening the total length of his service if he agreed to extend the length of his tour, (7) that he accepted this option, completed his military service in September of 1969, and returned home to work full time on the family farm, (8) that he began a partnership arrangement with his father whereby they both worked on the farm and divided the farm income evenly, (9) that, although his father continued to pay the mortgage on the farm

property, he (Dwight Saddler) incurred substantial debt in his own name for the benefit of the farming operation, (10) that, when his father's bank account for the farm became overdrawn, he (Dwight Saddler) paid these overdrafts, (11) that, on one or two occasions, he also paid the property taxes on the farm, (12) that, at the time of his father's death in November of 1985, his mother (Edwina Groom Saddler) assured him that he would receive the Hancock Farm at her death, and (13) that he continued to work on the farm, manage the farm, and incur more debt for the benefit of the farm until his mother's death in May of 1997.

It is undisputed that both John T. and Edwina Groom Saddler were very private people who did not routinely discuss business or financial matters with other members of the family. Thus, it is not surprising that Dwight Saddler and his parents never discussed their alleged agreement while in the presence of Leonard and/or Paula Saddler. Dwight Saddler did, however, discuss the alleged agreement with Leonard Saddler on at least two occasions, once around the time of Leonard Saddler's marriage and a second time approximately two years prior to their mother's death. Additionally, Katherine Saddler testified that approximately one year after she married Dwight Saddler in 1972, he told her about the alleged agreement that he had with his parents. Paula Saddler testified that on the Sunday prior to her mother's death, she had a discussion with Dwight Saddler in which he stated to her that when their mother dies, the farm would belong to him.

In support of their contention that the trial court erred in imposing a resulting trust in the case at bar, Leonard and Paula Saddler emphasize several pieces of evidence suggesting that it was the intention of Edwina Groom Saddler to dispose of the family farm without regard to any agreement regarding the Hancock Farm. First, it is undisputed that Edwina Groom Saddler had an equal amount of love and affection for her three children. Willy Harvey, Edwina Groom Saddler's long time friend and hairdresser, testified that Edwina Groom Saddler once commented to her that she had three children and that she wanted them to share equally in her estate. On December 16, 1986, Edwina Groom Saddler executed a last will and testament purporting to divide her estate equally among her three children. Dwight Saddler testified that, when he learned of the content of his mother's will, he reminded her of their earlier agreement regarding the Hancock Farm, at which time she assured him that she would "go back and redo" her will. Thereafter on December 18, 1986, Edwina Groom Saddler executed a holographic codicil stating the "[i]f Dwight still wants the farm Leonard and Paula help him all you can for him to own it in his and his son's name." According to Dwight Saddler, his mother then informed him that she had redone her will and that the new will divided her estate in accordance with their prior agreement.

After hearing all the proof in the case at bar regarding the alleged agreement between Dwight Saddler and John T. and Edwina Saddler, the trial court ruled as follows:

> But I do think – going back to the proof, I think that the proof is that the farm was in debt at that time, that Mr. Saddler, the oldest son came back and tried to get it, – I mean Dwight. It is a little puzzling to me that the father could hold off a year or so with production credit of those things with that promise that Dwight was going to come back, really over there in harms way, he even didn't know if he would come

back. Honestly, there was the dream that he could but thank goodness you were able to come back without any terrible injury. But I think by clear and convincing that – and I'm going by the actions of the parties that – of course, it would make sense that Dwight would want to come back and farm, but I just think that if there wasn't some agreement made that he would be looking out for himself more. That is just the extent of the proof.

. . . .

So I feel by clear and convincing evidence – I know that this will be reviewed, and all of you have a right to do that, to review my decision, but I believe by clear and convincing evidence there was a deal made between Dwight and his father. Of course, his father had died in 1985. And I think the deal was made at that time to affirm that deal, when the mother said, "The agreement was I can't pay any of the debts and you'll have to pay them all." And that's, in fact, what he has attempted to do.

So, obviously, she changed her mind from 1985 until her death in 1997. And that's her reason for the Will. And I think even after Dwight confronted his mother about it, after she had gone and made a Will, she was trying the best that she could, to make it right by just saying that Leonard and Paula would help him with the farm. But what does that really mean? I think it just means that she knew that there was something owed to him and that at this point she really wanted it to be divided equally. But I think it's kind of almost a promis[s]ory stumble, I think th[at] a promise was made, and I think that Dwight had stayed there on the farm, and as a result of that – I wish that it was different. I wish it was where it was a smaller part of the estate, because I know that your mom and dad would want each of you to share in whatever was left at the time of their death. Of course, on the other hand, if it hadn't been for Dwight, there may not even have been any farms to divide up.

But I think that's the way that, through clear and convincing proof, that it would have to be, is a resulting trust of that Hancock farm.

When making a determination regarding an issue of fact such as the existence or nonexistence of the alleged agreement between Dwight Saddler and his parents, a trial court must necessarily evaluate the credibility of the witnesses who testify regarding the matter. *See, e.g., St. Clair*, 857 S.W.2d at 51. Because a trial court has the opportunity to observe and evaluate the appearance and demeanor of the witnesses, the court's findings regarding witness credibility are entitled to great weight on appeal. *See id.* From the ruling of the trial court in the instant case, it is apparent that the court believed the testimony of Dwight Saddler regarding the existence of an agreement with his parents. The trial court's assessment of Dwight Saddler's credibility is consistent with the testimony of several witnesses, including Paula Saddler, who stated that Dwight Saddler is an honest and truthful person. We recognize that the burden of proof in the case at bar is a heavy one. The trial court concluded that Dwight Saddler carried this burden. After reviewing all of the

proof in the case at bar, we cannot say that the conclusion reached by the court is contrary to the preponderance of the evidence. Rather, we agree with the trial court that there was an agreement between Dwight Saddler and his parents that entitled Dwight Saddler to receive the Hancock Farm upon the deaths of John T. and Edwina Groom Saddler.[1] Like the trial court, we believe that, if such an agreement did not exist, Dwight Saddler would not have agreed to extend his tour of duty in Vietnam, invested years of labor on the farm, incurred substantial debts for the benefit of the farm, paid the taxes on the farm, and paid the overdrafts that occurred on the farm account. We therefore affirm the trial court's ruling that the Hancock Farm is the subject of a resulting trust for the benefit of Dwight Saddler.[2]

Based on the foregoing, the ruling of the trial court is affirmed. The costs of this appeal are assessed to Leonard and Paula Saddler, and their surety, for which execution may issue if necessary.

_____

DAVID R. FARMER, JUDGE

---

[1] We recognize that this agreement is contrary to the intent expressed by Edwina Groom Saddler in her December 16, 1986 will and the comments that she made to Ms. Harvey. The holographic codicil that Edwina Groom Saddler executed on December 18, 1986, however, could be construed in a manner that is consistent with the agreement.

[2] In light of this ruling, we deem it unnecessary to address the issue raised on appeal by Dwight Saddler, that is, whether the trial court erred in sustaining Leonard and Paula Saddler's exception to the claim that he filed against the estate of Edwina Groom Saddler.