# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### JUNE 22, 2004 Session

## MARY ALLENE STORY v. MALCOLM EUGENE LANIER

**Direct Appeal from the Chancery Court for Lake County**
No. 4703     J. Steven Stafford, Chancellor

---

**No. W2003-02194-COA-R3-CV - Filed November 17, 2004**

---

This case primarily involves a dispute over the proper characterization of property held by the parties during a thirty year relationship. The parties lived together during their relationship, but never married. Mary Story filed suit against Malcolm Lanier, alleging that a marriage by estoppel existed between the parties, or in the alternative, that an implied partnership was created, justifying the equal division of all bank accounts, personal property, and real property owned by the parties. The chancellor granted Mr. Lanier's Motion to Dismiss Ms. Story's marriage by estoppel claim but allowed her to proceed on an implied partnership theory. Following a bench trial, the chancellor found that an implied business partnership existed in a restaurant purchased by Mr. Lanier in 1974 but not in any real property or bank accounts. Both parties have appealed the chancellor's rulings regarding the division of the parties' assets. Ms. Story also appeals the chancellor's denial of pre-judgment interest, the finding that no resulting or constructive trusts existed as to the real property and bank accounts, and a ruling regarding Mr. Lanier's pleadings. For the reasons stated below, we affirm the decisions of the chancery court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

Ralph I. Lawson, Dyersburg, TN, for Appellant

Joe H. Byrd, Jr., Jackson, TN, for Appellee

**OPINION**

## I. Facts and Procedural History

On February 4, 2000, Mary Allene Story ("Ms. Story" or "Appellee") filed a Petition to Establish Marriage by Implied Partnership and Marriage by Estoppel in the Chancery Court of Lake County. Ms. Story alleged that since 1970, she and Malcolm Eugene Lanier ("Mr. Lanier" or "Appellant") have lived together as husband and wife, even though the parties never formally married. Ms. Story further alleged in her petition that during the course of their thirty year relationship, she and Mr. Lanier purchased both real and personal property together, and that through her contributions to the relationship Mr. Lanier was able to amass substantial funds in his bank accounts. Ms. Story asked the chancery court to find that a marriage by estoppel, or in the alternative an implied partnership, existed between the parties and to divide the property equally between them.

No further pleadings were filed by Mr. Lanier until October 20, 2000, when he filed a Motion to Dismiss. In this motion, Mr. Lanier argued that Tennessee does not recognize common law marriage or marriage by estoppel, that there were insufficient facts to establish an implied partnership between the parties, and that Ms. Story's petition was barred by the statute of limitations and/or laches. On July 24, 2001, Ms. Story filed a Motion to Amend Petition, which the chancellor granted on January 19, 2002. In her amended petition, Ms. Story made two additional assertions beyond the allegations made in her original petition. First, she asserted that she and Mr. Lanier were partners in a fifty-eight acre farm operation which should be held in a constructive trust since Mr. Lanier obtained title to it by fraud, duress, and abuse of confidence. Second, when Mr. Lanier obtained title to the farm, a resulting trust was created when he allegedly promised that they would be joint owners in the property.

On June 10, 2002, the chancellor entered an order granting Mr. Lanier's Motion to Dismiss as to Ms. Story's claims for common law marriage and marriage by estoppel, but allowed Ms. Story to proceed with her implied partnership claim. Mr. Lanier filed an answer to Ms. Story's amended petition on October 28, 2002, denying every allegation contained therein.

On February 19 and 20, 2003, the chancery court heard controverted proof presented by both parties concerning the exact nature of the parties' relationship from 1970 until 2000. The chancellor heard testimony from Mr. Lanier, Ms. Story, neighbors, co-workers, and the parties' children from previous marriages. Ms. Story's marriage ended in divorce in 1969, while Mr. Lanier's marriage ended in divorce in 1971. The parties began dating around the time Mr. Lanier's divorce became final. Ms. Story asserted at trial that in 1971, Mr. Lanier began living with her and her three children at her mobile home in Tiptonville, Tennessee, a fact which Mr. Lanier disputed. The trial court viewed exhibits presented by both parties relating to where Mr. Lanier received his mail. According to Ms. Story, during their relationship Mr. Lanier would pay the larger bills, while she paid the smaller living expenses. The court also heard testimony regarding other relationships

engaged in by both parties while the were involved with each other. At no time during their thirty year relationship did the parties commingle their funds by sharing a bank account, either for personal or business reasons. Ms. Story took out life insurance policies on the parties, with each being a reciprocal beneficiary of the other person's policy.

In 1971, Ms. Story owned fifty-eight acres of farm land in Lake County, which represented her share of an inheritance from a larger tract of land owned by her deceased father. The land was subject to the life estates of her mother and grandmother at the time. Ms. Story also received a check representing her share of the income generated from the land. During her previous marriage, Ms. Story's husband secured a $5,700 loan by using the fifty-eight acre farm and her residence in Tiptonville as collateral. By 1972, Ms. Story was unable to make payments on the note, and the bank was in the process of foreclosing on the farm and her home. Mr. Lanier contends that he attempted to assist Ms. Story with getting a loan to pay off the mortgage, but that the bank would not lend her the money due to the life estates encumbering the property. Mr. Lanier subsequently borrowed the money necessary to pay off the loan in exchange for Ms. Story executing a warranty deed of the property to him. Mr. Lanier intended to use the farm as collateral in securing the loan.

In order to conduct the transfer, the parties met in the offices of Ms. Story's lawyer on June 7, 1972. According to Mr. Lanier, he originally decided not to go through with the transaction. Mr. Lanier was aware of the life estates encumbering the land at the time of the transaction, and this raised his concerns about his ability to later sell the subject realty with Ms. Story's lawyer. Ms. Story testified that Mr. Lanier promised her that if she would grant the farm to him, they would farm the land together and share equally in possession. Mr. Lanier denied ever making such a promise. On June 23, 1972, Mr. Lanier obtained a loan in the amount of $6,083.50, using the farm as collateral. By paying off the mortgage on the farm, this also released the lien on Ms. Story's mobile home. Mr. Lanier contends that upon receiving the title to Ms. Story's home from the bank, he immediately handed it to her. Ms. Story never co-signed the loan and never helped Mr. Lanier make any payments toward the loan. The parties also never executed a written agreement concerning the transaction, and the deed itself makes no mention of any joint ownership arrangement. Ms. Story testified that the estimated value of the land at the time of the transaction was $27,000. Mr. Lanier did not pay Ms. Story any additional consideration beyond paying off the mortgage. After Mr. Lanier became the record owner of the parcel, the income payments previously received by Ms. Story, ranging from $200 to $300 a year, were sent to Mr. Lanier and deposited into his personal bank account.

In 1974, Mr. Lanier purchased a restaurant for $2500. Ms. Story testified that Mr. Lanier told her he would buy the restaurant if she would agree to run it, which she did. Mr. Lanier presented testimony from the previous owner stating Ms. Story was not involved in the purchase of the restaurant, a fact corroborated by Ms. Story. The parties never executed a writing memorializing this agreement. Mr. Lanier paid all the taxes on the restaurant, bought all the supplies and fixtures, secured the necessary permits and licenses, and purchased insurance on the business. Ms. Story's contribution to the business consisted of working there without compensation. The children of both parties were permitted to eat meals at the restaurant free of charge. Mr. Lanier testified that Ms.

Story had access to the cash drawer while working there, and may have occasionally taken money to purchase something for the children or herself. A former employee of the restaurant testified that she considered herself to be employed by both parties. The profits from the restaurant went solely into Mr. Lanier's bank account. Ten months after opening the restaurant it was destroyed by fire. As a result, Mr. Lanier received a check for $6,500 from the insurance company, which he did not share with Ms. Story. Ms. Story testified that she was responsible for keeping the books at the restaurant, and estimated that the business produced revenues of between $700 to $800 per week during the time it was operating.

Mr. Lanier paid off the mortgage on the farm on August 13, 1979. In 1986, Mr. Lanier had a survey conducted of the farm and discovered that a farm house was included in the fifty-eight acres. Mr. Lanier and Ms. Story subsequently moved to the farm house that same year, and made improvements to the home with funds from Mr. Lanier's bank account. Mr. Lanier entered into transactions with other farmers, allowing them to farm the land in exchange for a share of the profits. The exact amount of income the farm produced was a subject of debate between the parties. Between 1993 and 2000, Mr. Lanier permitted Mr. Terry Jamison, Jr. ("Mr. Jamison"), owner of Magnolia Farms, to farm the land. Ms. Story testified that the farm occasionally produced between $12,000 and $13,000 in net income a year. Mr. Lanier permitted Mr. Jamison to farm the land in exchange for one-fourth of the profits realized from the sale of the crops. Mr. Jamison's son, the accountant for the farming business, testified that they paid Mr. Lanier directly for his one-fourth share of the revenues generated from the farm from 1993 to 2000. Mr. Lanier also worked for Mr. Jamison at $6.50 an hour spraying crops. Mr. Lanier testified that in addition to the revenue generated by the crops, he also received an additional $5,000 to $6,000 per year as an employee of Mr. Jamison. Mr. Lanier made all the decisions concerning the operation of the farm. All of the property taxes on the farm, insurance, and farming supplies were paid for by Mr. Lanier. Ms. Story testified that she participated in the farm operation by pulling weeds, by logging the hours Mr. Lanier worked so that he could be paid by Mr. Jamison, and by keeping a garden from which she canned food.

At one point, Mr. Lanier had his son construct a shop building on the property. All the materials for the construction of the building were purchased with funds from Mr. Lanier's account. Ms. Story stated that her contribution to this effort consisted of making meals for the people working at the shop. Ms. Story estimated the cost of the building to be around $15,000. In 1995, Mr. Lanier suffered a heart attack. Ms. Story paid a portion of Mr. Lanier's health insurance premiums and cared for him during this period of time. In 1998, Ms. Story moved out of the farm house for a period of three months, but subsequently returned. At the time of Ms. Story's lawsuit in 2000, Mr. Lanier had an estimated $90,000 in his bank account which he characterized as his life savings. Ms. Story estimated the current value of the farm to be $75,000.

Following the trial, both parties submitted supplemental briefs to the chancery court summarizing the facts and law before the court. In her brief, Ms. Story alerted the chancellor to the fact that although Mr. Lanier filed an answer to her amended petition on October 28, 2002, he never filed an answer to the original petition. Ms. Story argued that, pursuant to the Tennessee Rules of

Civil Procedure, the court should find that Mr. Lanier admitted all statements contained in the original petition which he failed to deny. On March 25, 2003, the chancellor entered an order, which included, in relevant part, the following factual findings:

> 1. An implied business partnership existed in 1974 between the parties in the ownership and operation of a restaurant for [forty-three weeks][1] in the town of Tiptonville, Tennessee, which earned approximately $700.00 per week or $30,100.00 during the business operation, one-half (½) of which would be the property of Plaintiff, or $15,050.00. Further, following a fire at the restaurant, Defendant received an insurance payment of $6,500.00, and after deducting the initial purchase price of the restaurant paid solely by Defendant of $2,500.00, the parties shall divide the remaining $4,000.00 equally. Therefore, the Court awards Plaintiff a judgment of $17,050.00 of Defendant.
> 2. The Court finds the Plaintiff failed to show an implied business partnership existed between the parties pertaining to the fifty-eight (58) acre farm or the bank account monies owned by Defendant described in the proof as his life savings.
> 3. The Court finds the Plaintiff failed to establish by clear and convincing evidence the existence of a resulting trust between the parties pertaining to the fifty-eight (58) acre farm owned by Defendant or the bank account monies belonging to Defendant as his separate properties.
> 4. The Court finds the Plaintiff failed to establish by the proof the existence of a constructive trust between the parties pertaining to the fifty-eight (58) acre farm or the bank account monies belonging to Defendant as his separate properties.

Ms. Story filed a Motion for New Trial or to Reopen, Alter or Amend Judgment on May 18, 2003. In her motion, Ms. Story alleged that the chancellor's findings were contrary to the law and evidence, that the court erred in its findings related to Ms. Story's personal property, that the court erred in not awarding Ms. Story pre-judgment interest on her share of the restaurant, and that the court erred in not finding the existence of a constructive or resulting trust in the farm. The chancellor denied Ms. Story's motion in an order filed on August 7, 2003, stating:

> 1. That prejudgment interest is most unusual. Pursuant to International Flight Center v. City of Murfreesboro, 45 S.W.3d 565, 574 (Tenn. App. 2000) citing Myint v. Allstate Ins. Co., 970 S.W.2d

---

[1] The chancellor's original order stated the duration of the restaurant partnership was forty-three months. The chancellor issued a consent order on April 15, 2003, correcting the original judgment so that it reflected a partnership of forty-three weeks in duration.

920, 927, the Plaintiff, MARY ALLENE STORY, is not entitled to prejudgment interest due to the Plaintiff's failure to request same within her Complaint or within her Amended Compliant. See Tennessee Rules of Civil Procedure, Rule 8.01.

2. That had said issue been plead, however, the Court finds that prejudgment interest should still be denied, the Court finding that the facts of the instant proceeding fit within one of the three exceptions to the award of prejudgment interest set forth by the Court of Appeals of Tennessee, Middle Section decision by Judge William C. Koch, Jr., in *Scholz v. S.B. International, Inc.*, 40 S.W.3d 78, 81-84, specifically as applicable to the facts of this case where "the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight".

3. That in this case, the parties' business relationship ended in 1974 and their personal relationship ended in the late 1990s yet no demand for payment was made by the Plaintiff to the Defendant, MALCOLM EUGENE LANIER, as toward the end of their relationship, sometimes they were together, sometimes they were not.

4. That if the Court is incorrect in the findings set forth above, the earliest date from which prejudgment interest could have been awarded to the Plaintiff by the Defendant would be the date of the institution of this action on February 4, 2000.

Both parties have appealed the judgment of the chancery court , presenting the following issues for our review:

     I.     Whether the chancery court erred in finding that an implied business partnership existed in the restaurant purchased in 1974, but not in the fifty-eight acre farm or money held in Appellant's bank account;

     II.     Whether the chancery court erred in finding that Appellee was not entitled to prejudgment interest on the amount of the judgment reflecting her share of the restaurant;

     III.     Whether the chancery court erred by not finding that Appellant admitted all averments in Appellee's original petition, excluding those averments relating to common law marriage and marriage by estoppel, due to Appellant's failure to file a responsive pleading;

     IV.     Whether the chancery court erred in finding that Appellee failed to show the existence of either a constructive trust or resulting trust in the fifty-eight acre farm.

## II. Implied Business Partnerships

On appeal, Mr. Lanier asserts that the trial court erred in finding that the parties engaged in an implied business partnership when they purchased the restaurant. Mr. Lanier argues that Ms. Story failed to carry her burden in proving that an implied business partnership existed in the

restaurant, and that the court below erred in finding the existence of an implied business partnership based on the evidence presented at trial. In addition, Mr. Lanier contends that there was insufficient evidence to justify the court's finding that the restaurant produced revenue in the amount of $700 a week. Ms. Story does not contest the trial court's finding as to the restaurant, but argues that the trial court erred in finding that the evidence did not establish an implied business partnership in the fifty-eight (58) acre farm and bank account.

"Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court." *Martin v. Coleman*, 19 S.W.3d 757, 760 (Tenn. 2000); Tenn. R. App. P. 13(d) (2003).

> "What will constitute a partnership is a matter of law, but whether a partnership exists under conflicting evidence is one of fact." *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 68 (Tenn. Ct. App. 1955); *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001). Accordingly, since we are asked by [the parties] to review the Trial Court's determination [concerning a partnership] between the parties, our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the Trial Court, unless the preponderance of the evidence is otherwise. Tenn. Rule App. P. 13(d); *Alexander v. Inman*, 974 S.W.2d 689, 692 (Tenn. 1998). The Trial Court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

*Kuderewski v. Hobbs*, No. E2000-02515-COA-R3-CV, 2001 Tenn. App. LEXIS 561, at *9–10 (Tenn. Ct. App. July 30, 2001).

The parties conceded at trial that no written partnership agreement existed concerning the restaurant. When a partnership agreement is not in writing, the party alleging the existence of a partnership carries the burden of proving that fact by clear and convincing evidence. *Tidwell v. Walden*, 330 S.W.2d 317, 319 (Tenn. 1959); *B & S Enter. v. Rowland*, No. E2003-00458-COA-R2-CV, 2004 Tenn. App. LEXIS 49, at *3 (Tenn. Ct. App. Jan. 26, 2004); *Kuderewski*, 2001 Tenn. App. LEXIS 561, at *10–11; *Badger v. Boyd*, 65 S.W.2d 601, 642 (Tenn. Ct. App. 1933). The legislature has defined a partnership as "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit." Tenn. Code Ann. § 61-1-101(6) (2003). Our Supreme Court, in a case factually similar to the one presently before the Court, stated:

> In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties. *Roberts v. Lebanon Appliance Service Co.*, 779 S.W.2d 793,

795 (Tenn. 1989). If the parties' business brings them within the scope of a joint business undertaking for mutual profit—that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them—the result is a partnership whether or not the parties understood that it would be so. *Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 232 S.W. 961, 969–70 (1921).

Moreover, the existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. *Wyatt*, 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. *Roberts*, 779 S.W.2d at 795–96. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship. *Wyatt*, 281 S.W.2d at 67. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

*Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991).

In *Bass*, the Supreme Court was asked to decide whether the evidence presented at trial was sufficient to establish that the parties were implied business partners. *Id.* at 39. The parties began dating in 1974, and subsequently began living together in 1975.[2] *Id.* at 40. Mr. Bass purchased a restaurant a year later, and Ms. Bass initially operated the restaurant by herself. *Id.* Mr. Bass ultimately quit the job he held at the time and began working at the restaurant with Ms. Bass. *Id.* Ms. Bass was never compensated for the work she performed at the restaurant. *Id.* The restaurant burned in 1981, and Mr. Bass opened a video game business. *Id.* Ms. Bass contributed to the video game business by helping Mr. Bass service video machines, kept most of the business records, collected revenues from the machines, and issued checks. *Id.* Ms. Bass testified that the checking account, savings account, and real property were all under Mr. Bass' name. *Id.* The trial court ruled that the parties formed an implied business partnership as to the restaurant and the video game business. *Id.* at 41. On appeal, the Tennessee Supreme Court affirmed the trial court's findings.

---

[2] The parties in *Bass* were married in 1980, but were subsequently divorced later that year. *Bass*, 814 S.W.2d at 40. They continued to live together following the divorce. *Id.*

*Id*. at 44. In affirming, the Supreme Court noted that the parties pooled their money to start the restaurant, used proceeds from the restaurant to start the video gaming business, used proceeds from the video gaming business to purchase the convenience store, pooled their income, shared profits from the businesses, Ms. Bass invested her time and labor in operating the video gaming business and restaurant without compensation, she kept records for the gaming business and issued checks, and she assisted Mr. Bass in making decisions regarding the gaming business. *Id*. at 43–44. In addition, Mr. Bass built a home on his property, and purchased a convenience market and used car business. *Id*. Mr. and Ms. Bass resided in the home until Mr. Bass died in 1986. *Id*.

In the instant case, Mr. Lanier, citing *Martin v. Coleman*, 19 S.W.3d 757, 761 (Tenn. 2000), argues that cohabitation alone is an improper basis on which to find the existence of an implied business partnership. In *Martin*, our supreme court held that the trial court erred in finding an implied business partnership in a retirement account held by one of the parties to a long term meretricious relationship. *Id*. at 758. Mr. Coleman maintained two retirement accounts through his employer, to which Ms. Coleman made no direct financial contributions. *Id*. at 759. The couple filed joint tax returns, purchased health insurance as husband and wife, and had reciprocal wills referring to each other as husband and wife. *Id*. Mr. Coleman purchased a used car business, and Ms. Coleman claimed a partnership interest in that business. *Id*. Ms. Coleman only worked at the business for two days, was not authorized to issue checks, and performed no other duties at the business. *Id*. In reversing the trial court's decision, finding that an implied partnership existed, the supreme court stated:

> That the parties cohabited for eleven years and were married at one point was not a factor in our decision [in *Bass*]. We stressed that the ordinary laws pertaining to partnership, not the laws of domestic relations, apply in a situation in which a business partnership can be implied from the facts and circumstances, a meretricious relationship notwithstanding.
>
> In this case, we are asked by the estate of Delores Coleman to extend our holding in *Bass* to find that an implied partnership extends to the retirement benefits accumulated by Robert Coleman. The parties' only business relationship involved a used car business. Ms. Coleman's participation in the used car business was minimal at best. The estate does not contend that the used car business produced or contributed to Mr. Coleman's pension or 401(k). In apparent recognition of this fact, the trial court held that Ms. Coleman "indirectly contributed to the retirement and/or pension with Johnson Control by providing all of those amenities and benefits customarily provided by a wife, although she made no direct monetary contribution to those funds."
>
> While Ms. Coleman's contribution as a homemaker could be considered in dividing marital property pursuant to Tenn. Code Ann. § 36-4-121(c)(5), the parties were not married. A marriage would

have created a form of "partnership" entitling each party to the benefits of the statute regulating the dissolution of marriage. To hold that these retirement benefits are available as partnership assets would require this Court to expand the concept of implied partnership beyond the business relationship now conceded by the parties. *In essence, we would be required to hold that unmarried couples may create an implied partnership simply by their continued cohabitation.* We decline to do so.

*Id*. at 761–62 (emphasis added). Ms. Story seeks to differentiate the present case from the facts in *Martin*, alleging that she made direct financial contributions to the parties' undertakings in that she provided secretarial work, worked at the restaurant, provided health care coverage to Mr. Lanier following his heart attack, performed duties as a housekeeper, and used her Social Security disability benefits to pay for their joint expenses.

"The *Bass* Court delineated a facts and circumstances analysis, requiring the courts to examine each case to determine the intent of the parties as ascertainable from their acts." *Norris v. Norris*, No. 03A01-9403-CH-00101, 1994 Tenn. App. LEXIS 520, at \*16 (Tenn. Ct. App. Sept. 15, 1994). "[I]n *Bass*, the Supreme Court did not promulgate any neat prescription or formula involving number of work hours, extent of bookkeeping activity or financial contribution necessary to find an implied partnership." *Id*. at \*19.

We disagree with Mr. Lanier's assertion that the only possible justification for the trial court finding an implied partnership in the restaurant was the parties' cohabitation. At trial, Ms. Story did testify that her only contribution toward the restaurant was her labor for the ten months the business was in operation. She also stated, however, that she worked for free and did not expect a salary because the money was to go toward paying the bills for the restaurant. The proof also showed that Ms. Story and her children ate meals at the restaurant for free. Ms. Story admitted that she never contributed any money toward the purchase of the business and never paid toward any taxes assessed on the business. She presented proof, however, which tended to show that her activities at the restaurant were consistent with that of a co-owner. This was supported by Mr. Lanier's own testimony that Ms. Story had access to the cash register, and she was free to remove money at any time. A former employee of the restaurant also testified that, during the time she worked at the restaurant, she believed she was working for both parties. In addition, the trial court had ample evidence with which to find that the restaurant made $700 a week in net profits. Ms. Story testified that she was responsible for keeping the books for the restaurant, a job which would give her intimate knowledge of such details. Mr. Lanier points to Ms. Story's statement at trial that she had no additional evidence to support her assertion about the restaurant's weekly profits. The trial court, however, received no evidence from Mr. Lanier contradicting this figure.

Next we turn to Ms. Story's assertion that the trial court erred in finding that no implied business partnership existed as to the farm and bank account. Sufficient evidence existed which the trial court could use to base its finding that no partnership existed in the farm and bank account. At

the time of the transfer in ownership of the farm to Mr. Lanier, Ms. Story was facing certain foreclosure by the bank. While the evidence suggests that Ms. Story did not receive the full fair market value for her land, she was represented by counsel during the transaction. This in itself indicates the transaction occurred at arms length. Out of this transaction, Ms. Story was able to keep her mobile home and to continue to reside on her share of the family farm. Ms. Story also testified that she never helped Mr. Lanier repay the loan. In addition, the deed contains no language showing the existence of any agreement between the parties to take as joint owners. While we are mindful of Ms. Story's contributions to the relationship following this transaction, we are directed to focus our attention upon the facts as they relate to the parties' decision to enter this particular transaction, not the facts as they relate to domestic matters. *Martin*, 19 S.W.3d at 761–62; *Bass*, 814 S.W.2d at 41.

"When the issues in a case turn upon the truthfulness of witnesses, the trial judge as the trier of fact in a nonjury case has the opportunity to observe the witnesses and their manner and demeanor while testifying and is in a far better position than this Court to decide that issue." *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 96 (Tenn. Ct. App. 1988). Based on our review of the record and the applicable legal principles, we cannot find that the proof before the trial court preponderates against the finding of an implied business partnership in the restaurant, but not in the fifty-eight acre farm and bank account.

### III. Pre-Judgment Interest

Neither Ms. Story's original petition nor her amended petition contained a request for prejudgment interest. The issue of prejudgment interest was first raised in the court below when Ms. Story filed her motion for a new trial. The chancellor denied that portion of Ms. Story's motion dealing with pre-judgment interest on the grounds that, pursuant to Tennessee Rule of Civil Procedure 8.01, she failed to request prejudgment interest in her complaint. On appeal, Ms. Story contends that the nature of this case is akin to the dissolution of a thirty-year partnership, and therefore, she was unable to request a specific monetary amount in her petition. In addition, Ms. Story asserts that the trial court's ruling effectively holds her to a higher standard of pleading than required under Tennessee law.

A trial court may award prejudgment interest pursuant to Tennessee Code Annotated section 47-14-123, which provides:

> Prejudgment interest, i.e. interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum; provided, that with respect to contracts subject to § 47-14-103, the maximum effective rates of prejudgment interest so awarded shall be the same as set by that section for the particular category of transaction involved. In

addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

Tenn. Code Ann. § 47-14-123 (2003). Our review of the trial court's denial of prejudgment interest in this case is governed by the following standard of review:

> An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found. *See State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). . . .

*Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

Tennessee Rule of Civil Procedure 8.01, governing the general rules of pleading in civil cases, provides:

> Claims for relief. — A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain: (1) a short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

Tenn. R. Civ. P. 8.01 (2003). In conjunction with the general standards of pleading set forth in Rule 8, a party seeking relief in the form of special damages must specifically state in their pleadings that such damages are requested. Tenn. R. Civ. P. 9.07 (2003).

Our supreme court first addressed the issue of whether Rule 9.07 requires a party to plead prejudgment interest as special damages in *Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994). In construing the statutory language found in Tennessee Code Annotated section 47-14-123, the court stated that "[t]his definition recognizes that an award of prejudgment interest may be the main relief sought, i.e. 'in the nature of damages,' or relief incidental to recovery, i.e. 'as an element of damages.'" *Id*. "Prejudgment interest must be plead specifically if it is an 'item of special

damage.'" *Id*.; Tenn. R. Civ. P. 9.07 (2003).  The Court characterized special damages as follows:

> Where damages, though the natural results of the act complained of, are not the necessary result of it, they are termed "special damages" which the law does not imply and which must be alleged in order that evidence on the subject may be admissible.

*Mitchell*, 876 S.W.2d at 831 (quoting *Lance Prod. v. Commerce Union Bank*, 764 S.W.2d 207, 213 (Tenn. Ct. App. 1988)).  Turning to whether prejudgment interest must be plead specially, the court stated:

> The allowance of prejudgment interest, like attorney's fees, is discretionary with the trial court, *Uhlhorn v. Keltner*, 723 S.W.2d 131, 138 (Tenn. Ct. App. 1987), but, "the general rule is to allow interest in all cases where the amount of the debt is certain and not disputed on reasonable grounds."  *Textile Workers Union v. Brookside Mills, Inc.*, 205 Tenn. 394, 402, 326 S.W.2d 671, 675 (1959).  For example, in *Schoen v. J.C. Bradford & Co.*, 667 S.W.2d 97 (Tenn. Ct. App. 1984), the Court of Appeals affirmed the allowance of prejudgment interest on the amount due plaintiff for a share of certain business profits which the defendant had refused to pay.  The court held that prejudgment interest was "an element of damages."  *Id*. at 101–2.
>
> Loss of use of funds due is the necessary result of the failure to pay an obligation according to its terms.  The usual means of compensating for this necessary result is the allowance of interest.  Interest recovered in order to make the obligee whole is the relief usually sought, and the allowance of prejudgment interest under such circumstances is "familiar and almost commonplace."  *See Deas v. Deas*, 774 S.W.2d at 170.  *Consequently, the recovery of prejudgment interest under such circumstances does not require that the plaintiff plead specially*.

*Id*. at 832 (emphasis added).

The chancellor, in finding that Tennessee Rule of Civil Procedure 8.01 requires a party to request prejudgment interest in their pleadings before it may be awarded, relied on our decision in *International Flight Center v. City of Murfreesboro*, 45 S.W.3d 565, 574 (Tenn. Ct. App. 2000).  We find the chancellor's interpretation of this case to be misplaced.  While the decision in *International Flight* did address a trial court's discretion in awarding prejudgment interest, the chancellor apparently relied on that portion of the opinion dealing with a party's failure to plead an affirmative defense in violation of Tennessee Rule of Civil Procedure 12.  *Int'l Flight*, 45 S.W.3d at 574.  In this case, we are not dealing with a situation where Ms. Story failed to request damages

from Mr. Lanier in any form. *See Mohn v. Graff*, No. E1999-01015-COA-R3-CV, 2000 Tenn. App. LEXIS 349, at *8–9 (Tenn. Ct. App. May 31, 2000). Ms. Story, in both her original and amended petitions, asked the court to find that an implied partnership existed and to divide all real and personal partnership property equally between the parties. "[P]re-judgment interest does not have to be demanded in the complaint to be awarded." *York v. Vulcan Materials Co.*, 63 S.W.3d 384, 390 (Tenn. Ct. App. 2001), *cert. denied*, No. E2000-02528-SC-R11-CV, 2001 Tenn. LEXIS 841, at *1 (Tenn. Dec. 10, 2001); *see also Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 929 n.8 (Tenn. 1998).

The chancellor, relying on *Scholz v. S.B. International, Inc.*, 40 S.W.3d 78 (Tenn. Ct. App. 2000), also concluded that even if Ms. Story had requested prejudgment interest in her petition, he would still have denied such a request. A trial court is vested with considerable discretion when determining whether prejudgment interest is warranted in a particular case, subject to the following principles:

> Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing.

*Myint*, 970 S.W.2d at 927 (citing *Mitchell*, 876 S.W.2d at 832). "The certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances." *Id*. at 928. "The test for determining whether the amount of damages is certain . . . is whether the amount of damages is ascertainable by computation or by any recognized standard of valuation." *Id*. "Additionally, the plaintiff is generally awarded prejudgment interest when the existence of the obligation is not disputed on reasonable grounds." *Int'l Flight*, 45 S.W.3d at 573 (citing *Myint*, 970 S.W.2d at 927).

In *Scholz*, this Court interpreted the supreme court's decision in *Myint* to represent a shift toward favoring an award of prejudgment interest "whenever doing so will more fully compensate plaintiffs for the loss of use of their funds." *Scholz*, 40 S.W.3d at 83. Judge Koch, however, tempered his discussion of the decision in *Myint* by stating:

> That is not to say that trial courts must grant prejudgment interest in absolutely every case. Prejudgment interest may at times be inappropriate such as (1) when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight, (2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed, or (3)

-14-

when the party seeking prejudgment interest has already been otherwise compensated for the lost time of its money.

*Id.* (citations omitted). This does not represent an all inclusive list of the reasons that could justify a court's denial of prejudgment interest. *Gen. Constr. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 526 (Tenn. Ct. App. 2002).

Although the trial court erred in ruling that a request for prejudgment interest must be stated in the complaint before it may be awarded, we cannot say that the trial court erred in denying prejudgment interest altogether. At the time Ms. Story filed her complaint, the exact value of any partnership assets was uncertain, especially since the trial court did not assign a value to the restaurant until after it heard all the evidence. While certainty in the value of the partnership assets would tend to favor an award of prejudgment interest, "[t]he converse, however, is not necessarily true." *Myint*, 970 S.W.2d at 928. "Accordingly, we must review the record to determine whether other equitable grounds exist that support the trial court's decision." *Scholz*, 40 S.W.3d at 83. We are mindful of the fact that Ms. Story has been deprived of the use of her share of the partnership assets since 1974. *See id.* at 82. In *Scholz*, this court characterized the function of prejudgment interest as follows:

> Parties who have been wrongfully deprived of money have been damaged in two ways. First, they have been damaged because they have not received the money to which they are entitled. Second, they have been damaged because they have been deprived of the use of that money from the time they should have received it until the date of judgment. Awards of pre-judgment interest are intended to address the second type of damage. They are based on the recognition that a party is damaged by being *forced* to forego the use of its money over time. Thus, our courts have repeatedly recognized that prejudgment interest is awarded, not to punish the wrong-doer, but to compensate the wronged party for the loss of the use of the money it should have received later.

*Id.* (citations omitted) (emphasis added). The record does not reveal that Mr. Lanier "forced" Ms. Story to forgo the use of her share of the partnership assets. Given the fact that Ms. Story waited until almost thirty years after the restaurant burned to bring suit for her share of the partnership assets, we cannot find that the chancery court abused its discretion in finding that the equities weighed against prejudgment interest in this case. *Compare Gen. Const. Contractors Ass'n*, 107 S.W.3d at 526, *and Christmas Lumber Co., Inc. v. Valiga*, 99 S.W.3d 585, 596 (Tenn. Ct. App. 2002), *with Hitchcock Metal Sources, Inc. v. Mulford*, No. E2003-00738-COA-R3-CV, 2004 Tenn. App. LEXIS 68, at *20–21 (Tenn. Ct. App. Jan. 24, 2004).

## IV. Failure to File a Responsive Pleading

Ms. Story argues that the chancellor erred by failing to find that, pursuant to Tennessee Rule of Civil Procedure 8.04, Mr. Lanier admitted all averments in her original petition, with the exception of those related to common law marriage and marriage by estoppel, by failing to file a responsive pleading. Ms. Story contends that our prior holding in *Edwards v. Edwards*, 501 S.W.2d 283, 290 (Tenn. Ct. App. 1973), finding that failure to raise this very issue at trial resulted in a waiver, should not be followed in this case. In support of this position, Ms. Story cites to our decision in *Dyer v. Farley*, No. 01-A-01-9506-CH-00229, 1995 Tenn. App. LEXIS 710, at *24–25 (Tenn. Ct. App. Nov. 1, 1995), where we referred to the language in *Edwards* as dicta. In the alternative, Ms. Story asserts that if we should find *Edwards* applicable, she complied by timely raising the issue with the trial court in her supplemental brief filed on March 3, 2003. Since this case was tried without a jury, we consider this issue despite the fact that Ms. Story failed to raise the issue in her motion for a new trial. *See* Tenn. R. App. P. 3(e) (2003); *Fahey v. Eldridge*, 46 S.W.3d 138, 142 (Tenn. 2001).

Tennessee Rule of Civil Procedure 8.04 provides, in relevant part, as follows:

> Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided. Averments in a pleading to which a responsive pleading is required are admitted when not denied in the responsive pleading . . . .

Tenn. R. Civ. P. 8.04 (2003). "This rule is not interpreted to mean that a party is privileged to go to trial without calling to the attention of the Trial Court the complete absence of a necessary pleading." *Edwards*, 501 S.W.2d at 290. "It would appear, therefore, that complete omission to answer must be taken advantage of by suitable application for default judgment, otherwise it is waived by proceeding to trial as if the pleadings were at issue." *Id.*; Tenn. R. Civ. P. 55.01 (2003); *see also Smith v. Smith*, 643 S.W.2d 320, 323 (Tenn. 1982) (approving of the decision reached in *Edwards*); *Barnes v. Barnes*, No. 02A01-9403-CH-00033, 1995 Tenn. App. LEXIS 175, at *10 (Tenn. Ct. App. Mar. 17, 1995).

Ms. Story's failure to bring the absence of an answer to her original petition to the attention of the trial court by filing a motion for default judgment resulted in a waiver of any violation of Rule 8.04. We find Ms. Story's argument that she properly notified the trial court of the alleged error by filing a supplemental brief *after* the trial had been conducted to be without merit. "The fact that plaintiff complained for the first time post-trial instead of on appeal, does not cure her failure to raise the question at trial." *Smith*, 643 S.W.2d at 323.

## V. Resulting or Constructive Trusts

The final issue for our consideration concerns the chancellor's finding that Ms. Story failed to prove the existence of either a resulting or constructive trust on the fifty-eight acre farm or the bank account. Ms. Story asserts that the court erred in not finding a resulting trust because Mr. Lanier promised her that if she deeded him the farm, they would share ownership equally. To show

her reliance on Mr. Lanier's alleged promise, Ms. Story points to the following: the parties' thirty-year relationship, the fact that she paid living expenses with her disability check, she was paid no additional consideration beyond satisfaction of the existing mortgage, and she could have sold the property to a third party for a profit. In the alternative, Ms. Story asserts that the trial court erred in not finding that a constructive trust existed in the farm or bank accounts, because Mr. Lanier obtained title to the property by making promises he never intended to keep. Mr. Lanier denies ever promising Ms. Story an equal interest in the property and denies any fraud on his part.

"To the extent that these issues involve questions of fact, our review of the trial court's ruling is *de novo* with a presumption of correctness and thus we may not reverse the court's factual findings unless they are contrary to the preponderance of the evidence." *Saddler v. Saddler*, 59 S.W.3d 96, 98 (Tenn. Ct. App. 2000) (citing *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)); Tenn. R. App. P. 13(d) (2003). We subject the chancellor's legal conclusions relating to constructive and resulting trusts to a *de novo* review with no presumption of correctness. *Jordan v. Jordan*, No. E2001-00005-COA-R3-CV, 2002 Tenn. App. LEXIS 96, at *9 (Tenn. Ct. App. Feb. 4, 2002) (citing *Gazenvoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997)).

The resulting trust and constructive trust both represent equitable devices used by courts to avoid unjust enrichment. *Harwell v. Watson*, No. E2003-01796-COA-R3-CV, 2004 Tenn. App. LEXIS 399, at *7 (Tenn. Ct. App. June 25, 2004). Our supreme court has described the purposes and characteristics of a resulting trust as follows:

> The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.
>
> While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another—sometimes referred to as a "purchase-money resulting trust"—they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust—on an inquiry into the consideration of a transaction—in order to prevent a failure

of justice. However, the particular circumstances under which a resulting trust may arise varies from jurisdiction to jurisdiction.

*In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993) (quoting 76 Am. Jur. 2d *Trusts* § 166, 197–98 (1992)). "The equitable power to establish a resulting trust applies with respect to both real and personal property." *Wardell v. Dailey*, 674 S.W.2d 293, 295 (Tenn. Ct. App. 1984). Such trusts often arise when the law presumes the parties intended to create a resulting trust. *Harwell*, 2004 Tenn. App. LEXIS 399, at \*6. "A resulting trust may be proven, and is typically proven, by parol evidence." *Saddler*, 59 S.W.3d at 99 (citations omitted). "However, when one attempts to create a resulting trust on the basis of parol evidence, such a trust must be shown by more than a mere preponderance of the evidence." *Wardell*, 674 S.W.2d at 295 (citations omitted). The party alleging the existence of a resulting trust must prove its existence by clear and convincing evidence. *Saddler*, 59 S.W.3d at 99; *Rowlett v. Guthrie*, 867 S.W.2d 732, 735 (Tenn. Ct. App. 1993); *Wardell*, 674 S.W.2d at 295. "The testimony of a single, interested witness typically is insufficient to establish a resulting trust by clear, convincing, and irrefragable evidence." *Saddler*, 59 S.W.3d at 99. When the facts establish the existence of a written instrument containing the terms of a transfer in real property, the plaintiff must satisfy the following burden:

> When the parol evidence of a resulting trust is in conflict with the terms of a written instrument, it is not essential that the evidence remove all reasonable doubt, but it must be so clear, cogent, and convincing that it overcomes the evidence to the contrary and the presumption that exists in favor of the terms of the written instrument.

*Id*. (citations omitted). In addition, "it is a general principle that the trust must arise at the time of the purchase, attach to the title at that time and not arise out of any subsequent contract or transaction." *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980) (citing *McClure v. Doak*, 65 Tenn. 364 (1873)).

"A constructive trust may only be imposed against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment or questionable means, has obtained an interest in property which he ought not in equity or in good conscience retain." *Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 249 (Tenn. Ct. App. 1992) (citing *Livesay*, 611 S.W.2d at 584).

> Tennessee has imposed constructive trusts in four types of cases. They are: (1) where a person procures the legal title to property in violation of some duty, express or implied, to the true owner; (2) where the title to property is obtained by fraud, duress or other inequitable means; (3) where a person makes use of some relation of influence or confidence to obtain the legal title upon more

advantageous terms than could otherwise have been obtained; and (4) where a person acquires property with notice that another is entitled to its benefits.

*Myers v. Myers*, 891 S.W.2d 217, 219 (Tenn. Ct. App. 1994) (citations omitted). As with a resulting trust, the plaintiff has the burden of proving, by clear and convincing evidence, the existence of a constructive trust based on parol evidence. *Browder v. Hite*, 602 S.W.2d 489, 493 (Tenn. Ct. App. 1980).

Our *de novo* review of the record indicates that the parties presented sharply divergent views of the facts surrounding the transfer of ownership in the farm. Our courts have required a higher degree of proof when a party seeks to establish a trust in real property based on parol evidence, indicating our reluctance to contravene a written deed. *See Gray v. Todd*, 819 S.W.2d 104, 108 (Tenn. Ct. App. 1991); *Wilson v. Wilson*, No. 119, 1989 Tenn. App. LEXIS 72, at *9 (Tenn. Ct. App. Feb. 3, 1989). In this case, we find that the evidence presented by Ms. Story at trial does not preponderate against the chancellor's finding that Ms. Story failed to prove the existence of a constructive trust or resulting trust.

## VI. Conclusion

For the reasons stated above, we affirm the decisions of the chancery court. Costs on appeal are taxed to Appellant, Malcolm Eugene Lanier, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE