Chadwell *v.* Wheless.

THOS. CHADWELL, Ex'r, etc. *v.* JOSEPH WHELESS *et al.*

AND

"CAROLINE M. BASS *v.* JOSEPH WHELESS *et al.*

1. SEPARATE ESTATE. *Power of wife. Conversion. Mortgage.* If the wife have a separate estate, with the power of a *feme sole*, and invest it in real estate and take a conveyance to herself without limitation, the separate estate will be lost, and she may convey by mortgage to secure a debt of her husband.

2. SAME. *Power of wife to alien.* If the conveyance to the separate use of the wife is silent as to the mode of alienation, the wife may convey by deed jointly with her husband.

3. ANTENUPTIAL CONTRACT. *Indenture signed by husband only. Effect on wife's estate.* An antenuptial instrument, in form an indenture, but executed by the husband only, cannot limit the estate of the wife in her property, but will bind the husband.

4. PURCHASER OF NOTES SECURED BY LIENS. *Knowledge.* The purchaser of a note is entitled to all liens securing it, whether he knew of their existence when he purchased the note or not.

5. RESULTING TRUSTS. *Innocent purchaser.* Resulting, or implied trusts will not prevail against an innocent purchaser.

6. MORTGAGE. *Purchaser pro tanto. Pre-existing debt.* The advance of money upon the faith of a mortgage is, *pro tanto*, a sale, and gives the mortgagee, to the extent of the money advanced, all the rights of a *bona fide* purchaser, but this rule does not apply as to pre-existing debts.

7. CONVEYANCE. *Deed absolute with a secret defeasance. The party who advances the money entitled to the security.* A conveyed to B by absolute deed. B executed his notes to A for purchase money. B by secret defeasance covenanted to reconvey to A when the notes were paid. A endorsed the notes to C, who advanced the money. *Held,* that C was the real mortgagee.

FROM DAVIDSON.

Appeal from the Chancery Court at Nashville. W. F. COOPER, Ch.

DEMOSS & MALONE for complainants.

N. BAXTER, SR., and ED. BAXTER for defendants.

E. H. EWING, Sp. J., delivered the opinion of the court.

On the 27th of January, 1847, a marriage took place in Mississippi between William N. Bilbo and Martha W. Foot, where said Martha then resided. She was owner at the marriage of a considerable estate, consisting of land, slaves, money in the hands of her guardian, notes and other personalty. On the day of the marriage a paper was drawn up by said William N., purporting to be an indenture (but which was signed by William N. alone) between the said W. N. and the said Martha, reciting that the latter was owner of the property aforesaid, and that a marriage was anticipated between said parties. It provides, that in case the marriage takes place the said William N. agrees he shall not have any title, interest or estate in said property, but that the same, and the profits, "shall be and remain the sole and exclusive estate of

the said Martha W. during her life, remainder to the child or children (if any) of the said marriage," and if the said Martha should die without leaving a child, then the said property shall vest absolutely in the said William and his heirs. And the said William covenants, within a reasonable time after coming into possession of said money and notes, to vest the same in slaves or other property, " which shall be the sole and separate estate of the said Martha, in the same manner and upon the same terms of all the other property aforesaid." It is further provided, that said parties may sell the interest of said Martha in said land, and the said William shall invest the proceeds in other property, " for the sole, exclusive use and benefit of the said Martha W., upon the same terms and in the same manner as the other property before mentioned, and subject to the same disposition and limitations thereon before mentioned ; the intention of the parties thereto being that all the estate of the said Martha whatsoever and wheresoever, real and personal, legal or equitable, and the profits, shall be the sole and separate estate of the said Martha for life, as aforesaid, free from the debts, contracts or liabilities of the said William, and after her death, without child of the marriage living, as aforesaid, to vest in the said William and his heirs." This paper, signed by the said William, had a scroll for the signature of said Martha, but was not in fact signed by her.

This deed is proved by the relatives of Mrs. Bilbo to have been accepted by her, though the form and manner of that acceptance is not shown. This deed

w:s acknowledged by W. N. Bilbo on the day of its date in Mississippi, and registered next day. A copy of it was afterwards registered in Davidson county, Tennessee, on the 27th January, 1852, the marriage having taken place on the day of the date of said instrument Said William N. and his wife lived in Mississippi until 1852. At the date of the marriage, as appears by the brief of the minor defendants by their counsel and guardian *ad litem*, it was the law in Mississippi that all of the property, real and personal, belonging to a single woman, should, upon marriage, continue to be her separate estate, not liable to her husband's debts, nor subject to his disposition. The minors referred to are the children of said William N. and Martha W., both of whom are now dead, and the first of whom died before the filing of the bills in these causes. In 1852 W. N. Bilbo and his wife removed to Tennessee, Davidson county.

Before, or shortly after leaving Mississippi, they had sold out and reduced to money and notes all of the property owned by Mrs. Bilbo. W. N. Bilbo, at the marriage, owned no property. On the 27th of May, 1857, John Sigler and wife sold and conveyed to " Martha W. Bilbo, her heirs and assigns forever," the land in controversy, partly for cash and partly on credit, for which the notes of Bilbo and wife were given. The whole was paid, from what funds does not otherwise appear than the fact that W. N. Bilbo is not shown to have had any property, and Mrs. Bilbo is not shown to have had any except the proceeds of her Mississippi estate, real and personal, and

its profits. On the 6th of April, 1860, William N. Bilbo and his wife, by deed of that date duly proved and recorded, with the privy examination of the wife in due form, purport to have sold and conveyed said land to Joseph Wheless (as shown by the deed), the consideration recited being $2,000 in cash and $5,000 to be paid at the expiration of twelve months, for which said Wheless had given his several promissory notes, payable in bank, to the said W. N. and M. W. Bilbo. In truth, however, no money was ever paid at any time by said Wheless. He merely executed his notes for $5,000, in sums of $1,000 each, payable to said W. N. and M. W. Bilbo, to enable them to raise money thereon, and the complainants' testators (as proved by Wheless) before maturity purchased said notes, they being endorsed by both of the payees. At the time of the execution of the deed aforesaid, Wheless executed and delivered to William N. and Martha W. Bilbo an instrument in writing, reciting the execution of said notes for $5,000, being the con-sideration of said deed, "for their accommodation, to raise money for their various purposes," and binding himself to reconvey to them said land upon the pay-ment by them of said notes.

The transaction was, in effect, a mortgage to secure the said notes in the hands of purchasers of them for value. The notes on which the bills are filed to subject the land, were bought by the complainants' testator before due, the money being paid to W. N. Bilbo. Neither Wheless nor the purchasers of these notes (Childress, who purchased two of them, and Wat-

kins, who purchased one) seem to have known anything about what fund went into Mrs. Bilbo's purchase from the Siglers, and the purchasers of the notes seem also not to have known of the existence of the defeasance. The notes not having been paid at maturity, judgments were obtained· on them in the circuit court of Davidson county against Wheless and both of the Bilbos, and execution returned *nulla bona.* The defeasance having been then discovered, these bills were filed to foreclose the mortgage, by sale of the land for the payment of the notes.

Before the filing of these bills, as ·already stated, said W. N. Bilbo had died; his wife survived him and was still alive, and there were three living children of the marriage; the wife and Wheless and the children were made defendants to the bills. Looking at these cases as standing simply upon the appearance presented by the deed from the Siglers to Mrs. Bilbo, and her and her husband's transactions with Wheless, the consideration advanced to the husband would be sufficient to sustain the mortgage as against her. It would be the ordinary case of the mortgage by the wife of her land to secure the husband's debt: *Mc-Ferrin* v. *White and Wife,* 6 Cold., 499.

It is urged, however, for the children of Mrs. Bilbo, that is not the case now before the court. That by the law of Mississippi, as it existed. at the time of their mother's marriage, her estate of every description, upon her marriage, became her separate estate, and that however its nature .may have been changed as from real into personal, from slaves and notes into

money, it still remained her separate estate; that her removal to Tennessee—that its investment in the Sigler property (though the deed to her was an ordinary one in fee) had no effect upon it; that the fund arising from the Mississippi property paid for it, and that the Sigler property was in effect her separate property when conveyed to Wheless, and that it was therefore void as to Mrs. Bilbo, and that the estate has descended to her children. The above defense has been urged rather in argument than in the pleadings, and yet it may be well to notice it. Without stopping to inquire what precise character may have been imposed upon the property in Mississippi by the law declaring it the separate property of the wife, and what her powers over it may have been there (especially as we have been furnished nothing upon that subject by the defendants), we shall regard the property in Mrs. Bilbo's hands in Tennessee as her separate property under our laws, and her as possessing over it the power of a *feme sole*. Among these would be that of converting it into real estate, to be held by her thereafter in fee without limitation. This she did do in fact, by electing to take the deed to herself in the form of the Sigler deed, and thenceforward so much of her estate was held by her free from the limitations of a sole and separate use. This she might convey for debt of husband: See *Voorhies* v. *Granberry*, 5 Baxt., 704, and the case above cited, *McFerrin* v. *White*. This would certainly be so as to third persons ignorant of the antecedents of the fund with which the Sigler estate was paid for.

This would have no analogy to the case of the seeking to trace her funds into land conveyed by the fraud of the husband to himself, when agreed by him to have them conveyed to her. And even if this were not so, and this land remained the separate property of the wife because paid for by her separate estate, yet so far as the children's claim stand only under the law of Mississippi, they would be excluded, because the wife had power even as to her separate estate to convey the same by deed jointly with her husband. In a well-considered case, *Young* v. *Young*, 7 Cold.; 461, decided by Judge Andrews, he says: "The conclusion is, that if the deed or will by which land is settled contains no limitation or restriction, express or implied, on a married woman's power to convey such estate, she may convey it in the same manner that she may convey her general estate." Since that, Judge Nicholson, in the case of *Gray* v. *Robb*, 4 Heis., 77, says, in a short paragraph, without allusion to the case in Coldwell (of which possibly he was not aware), that a married woman has no other power to convey her separate estate than that given in the deed creating it, and cannot convey unless expressly authorized to do so, referring to the very cases that had been so well considered by Judge Andrews and held not to apply. If it were necessary, we should reconsider the question now and adhere to the ruling in the case of *Young* v. *Young*, but as I am informed by my brethren, this has been already done in an unreported case at Jackson. All of these cases, as well as the present one, arose upon deeds executed

before the act of 1870, and of course are not governed by it. See also the case of *Molloy* v. *Clapp*, in which the . cases of *Young* v. *Young* and *Gray* v. *Robb* are incidentally considered—McFarland, Judge.

Again, it is said for the children, that the so-called antenuptial settlement makes the Mississippi property, as matter of *contract*, the separate estate of their mother for life, with remainder to them, and that even if their mother changed the nature of her own right in that portion of the property vested in the Sigler land, that she did not thus affect their rights, and that they still remain.

This brings us to consider the nature and effect of the paper drawn up and· signed by their father, but not signed by the mother.

This is a very different case from one where the husband settles property upon· his wife and undertakes to impose upon it limitations, which he may well do, being its owner. This, on the contrary, is on the part of the contemplated husband a mere and pure renunciation of his marital rights, and an undertaking on his part to limit and dispose of the estate of his contemplated wife, and is wholly without consideration, unless the bestowing of himself upon her may warrant so large an assumption. The failure to sign the instrument by the expected wife is wholly unaccounted for. But it is said her acceptance of the instrument binds her as effectually as if she had signed it; that the covenants in an indenture bind the accepting party who does not sign, as effectually as the conveying words do the party who does sign. This is all true enough,

where the accepting party derives benefits under the instrument and there are covenants to be performed by him or her. But there are no covenants here; it is a mere naked undertaking by the party who does not own the property, to dispose of it, and especially to give himself the attitude of *ultimus hæres* in certain contingencies. Bilbo's renunciation of marital rights to the property was a nullity, if the laws of Mississippi had already anticipated him in that respect.

The simple consideration of marriage has never been held to give effect to such disposition, in the absence of any words of alienation by the party to be affected by the instrument. In the words of the chancellor, "the instrument is clearly binding upon W. A. Bilbo only, and is utterly nugatory for any other purpose." This, in effect, disposes of the case. The children took no rights under the so-called ante-nuptial contract. The Sigler property belonged to Mrs. Bilbo; she mortgaged it to secure these claims, and it must be subjected to them.

No question in this aspect of the case can arise as whether the complainants were *bona fide* purchasers without notice, as there was nothing to take notice of. When they came to the knowledge of the defeasance, they had a right to avail themselves of it to make the deed a mortgage, as much as a man would to avail himself of a mine unexpectedly developed on land that he had bought without an idea of its existence, or as a purchaser of notes would of a lien expressly retained on land for their security and of which he had not heard at the date of his purchase.

21—VOL. 6.

But if all this was not so, and the property of Mrs. Bilbo was impressed by the trusts relied on, and the trust funds were distinctly traced into the property in dispute, the defense would be of no avail. At most it would be a resulting trust, or a trust to be implied from the use of the trust funds. But it is well settled that such trusts will not prevail against a *bona fide* purchaser for value and without notice: 1 White & Tudor L. C., 335, 4 Am. ed.; *Sanford* v. *Weedon,* 2 Heis., 81. There is no pretense that either Wheless or the testator of the complainants had any notice of any such trusts previous to the execution of the deed by Bilbo and wife to Wheless and the receipt of the money on Wheless' notes by Bilbo. The advance of money upon the faith of a mortgage of land is, *pro tanto,* a sale and gives such a mortgagee, to the extent of the money advanced, all the rights of a *bona fide* purchaser for value and without notice: *Moore* v. *Walker,* 3 Lea, 656; *Gordon* v. *English,* 3 Lea, 640. A mortgage or trust to secure a pre-existing debt would stand on a different footing, and it is the latter class of authorities which are referred to in the argument in behalf of the defendant on this point.

If the determination of the case rested alone upon this last ground, it might be necessary to examine with some particularity the pleadings to see whether the complainants have placed themselves there properly in the attitude of *bona fide* purchasers without notice. They have certainly done so in the proof. They are complainants, and having stated a *prima facie* case,

and the answer being merely that of a guardian *ad litem,* not specifically bringing out the question of *bona fide* purchaser, it may be, and probably is, that the proof was sufficient without amendment of the bill. In no event is this material to the determination of the case: See *Friedenwald* v. *Mullan,* 10 Heis., 226.

The decree of the chancellor will be affirmed with costs, and the case retained here for further proceedings.

It was remarked in argument that Childress and Watkins being only assignees of the notes, could not represent the vendor or assert any right of their own against the land. This would be true in an ordinary case under the decision in *Green* v. *Demoss,* 10 Hum., 371, and cases following it, but independent of the fact already considered, that there was in truth a mortgage, to the benefit of which they were entitled when discovered, this is not the ordinary case of assignees of vendee's notes. Wheless was but a sham, and Childress and Watkins are true payees and vendees of Bilbo and wife. It is as if they conveyed the land directly to Childress and Watkins. The deed, though, (being made to secure the loan of money), would have been held a mortgage without a formal or other defeasance.