IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 23, 2011 Session

## WANDA LEAVER WILLIAMS ET AL. v. BRANDON LEAVER ET AL.

**Appeal from the Chancery Court for Rutherford County**
**No. 091596CV      Robert E. Corlew III, Chancellor**

_____

**No. M2010-01874-COA-R3-CV - Filed September 27, 2011**

_____

The trial court imposed a constructive trust on a six-acre parcel of real property to carry out the intent of the father that his son and daughter would divide the property. The court ordered the sale of the property and division of the proceeds. We have concluded that the more appropriate equitable remedy is a resulting trust and have modified the judgment with regard to the disposition of the sale proceeds. Otherwise, we affirm the result reached by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

David Brock East, Murfreesboro, Tennessee, for the appellants, Brandon Leaver and Tammy Leaver.

William Kennerly Burger, Murfreesboro, Tennessee, for the appellees, Wanda Leaver Williams and Kevin Williams.

## OPINION

FACTUAL AND PROCEDURAL BACKGROUND

This is a dispute among family members over the ownership of a piece of property, nearly six acres in size, located in Rutherford County. Irvin and Linda Sue Leaver, husband and wife, purchased the property around 1975 and raised their two children, Wanda and Ted, there. About 15 years after buying the property, Irvin and Linda Sue decided to build a new house on the property. By 1997, both children and their spouses were also living on the

property in mobile homes. That year, Irvin and Linda Sue took out a mortgage in order to build a second story onto their house.

The events culminating in the current dispute began in 2002. Irvin and Linda Sue had a meeting with the two children and their spouses and expressed their desire to move to Florida. At that time, they owed about $36,000 on the mortgage. As will be discussed below, the parties disagree as to what was communicated to them at the meeting about the six-acre property. According to Wanda, Irvin and Linda Sue expressed an intention that the two children, Ted and Wanda, would divide the property equally. In December 2002, Irvin and Linda Sue quit claimed the property to Ted and his wife, Shelly. Without the knowledge of Wanda and her husband, Kevin, Ted and Shelly took out a loan for about $78,000 and used the money to pay off the loan on the property and to pay off their loan on their Clayton mobile home.

In January 2005, Ted and Shelly moved into the main house (where Irvin and Linda Sue had lived), and Wanda and Kevin moved into the Clayton mobile home formerly occupied by Shelly and Ted. Wanda and Kevin began making payments to Ted and Shelly for the mobile home. Shelly drew up the following agreement, which was signed by all four parties:

> This will serve as a legal document regarding the sale of 1995 Clayton mobile home and detached 30 x 30 garage. The price of the home is $30,000.00. Wanda & Kevin Williams agreed to pay $4000.00 down toward the purchase of the home. The remainder of the loan will be financed through Ted & Shelly Leaver. . . . The home is currently sitting on a 2 acre lot that has a mortgage against it. Wanda & Kevin may keep the home on the current lot free of charge as long as they wish. When the mortgage on the land is paid, the 2 acres will be deeded to Wanda & Kevin at no additional charge. In the event that Wanda & Kevin wished to sell the home, Shelly & Ted Leaver will be offered 1st option to purchase. . . . A receipt will be issued each month, and failure to pay will result in termination of this sale agreement. In addition to this agreement, Wanda & Kevin are responsible for paying yearly taxes on the home.

Linda Sue died in 2007. In 2009, Ted and Shelly were going through a divorce. In March 2009, Ted and Shelly sold their home and all six acres to Ted's son, Brandon, and his wife, Tammy, for $150,000. Ted and Shelly transferred the real property by warranty deed, and also gave Brandon and Tammy title to the 1995 Clayton mobile home. Wanda and Kevin had been making monthly payments of $320 to Ted and Shelly since 2005. After Brandon and Tammy bought the property, Wanda and Kevin made their monthly payments

to Brandon and Tammy. Beginning in August 2009, Wanda and Kevin missed several monthly payments. On October 20, 2009, Brandon and Tammy filed a detainer action in general sessions court against Wanda and Kevin.

Wanda and Kevin filed this lawsuit in November 2009 seeking a declaratory judgment and constructive trust with respect to the six-acre tract of property. They asserted equitable ownership in one-half of the value of the real property at issue. The trial court granted the petitioners' request to stay the detainer proceedings in general sessions court and consolidated the issues pertaining to the detainer warrant with the present case.

*The trial*

The case was tried over two days in March and April 2010. Ted Leaver represented himself; all other parties were represented by counsel. The trial court initially heard and denied a motion to dismiss filed by Shelly Leaver and joined by Brandon and Tammy Leaver.

The plaintiffs began by calling Irvin Leaver as a witness. He testified that, after he and his wife borrowed money to add a second floor to their house, his son (Ted Leaver) and his son-in-law (Kevin Williams) helped him do the work. At the time when Irvin and Linda Sue decided to move to Florida, the upstairs addition was ready to finish out with dry wall and flooring. Irvin stated that, until the time when the lawsuit was brought, he and his children and their spouses had a "wonderful relationship" and that everybody got along and helped each other.

Irvin Leaver gave the following testimony about the meeting in 2002:

A. Well, the whole thing was it was supposed to have been – I called Wanda and Kevin down to the house, and Sue did, and Ted and Shelly down to my house and I talked to them. I said, "You know, I want to go to Florida," and I couldn't afford to go to Florida and keep the place, and well I'm not going to put my kids out. I wasn't going to put the kids out. I could throw them off the property where I could sell the property. Sure I could have sold the property and made some money, but I'm not that kind of person. I didn't do that. I called them both – all four of them down there and set down and talked to them, me and my wife, and I told them what the situation was and everything, and I said, "You know, you all just take it and split the property."

Q. 50/50 each?

A. Yes, sir. And that was the agreement in there.

-3-

Q. . . . [W]as there any detail, any discussion between you and Sue and either of your children about exactly how that 50/50 gift was to be divided among the two of them?

A. No, there wasn't.

As to the quit claim deed in which he signed the property over to Ted and Shelly, Irvin testified that he went to the lawyer's office and signed papers when requested to do so by Ted. He had not changed his mind as to his intention to split the property 50/50 between the children. Irvin stated that he did not get involved in his children's financial affairs and did not ask questions about the papers he signed.

When cross-examined about signing the quit claim deed, Irvin gave the following testimony:

Q. . . . Did you realize when you signed this document, Mr. Leaver, that you were transferring ownership of your approximately 5.9 acres to Ted and Shelly Leaver?

A. No, I didn't. It's supposed to be both of them. So this here – they went in – Ted and Shelly went into the lawyer's office. . . . So they went in there and done it. Then the lawyer called us in there, just me and Sue, and that's when we signed the papers.

Q. So your answer to my question was, no, you didn't realize you were transferring ownership to just Ted and Shelly; is that right?

A. I don't know how to answer it. They was going to buy – to get the property, but I don't know what kind of deal that Wanda and Kevin had with Shelly and Ted.

Q. So you didn't know who you were signing it over to, correct?

A. No. I was just signing it over.

Irvin then admitted that he could not read. Irvin subsequently testified that he left it up to the children to work out the details of dividing the property between them:

-4-

It was supposed to have been 50/50. I didn't know I was just selling it to Ted and Shelly. It was supposed to have been 50/50. They're the ones – they were supposed to have worked out the loan and stuff.

Irvin specifically denied any notion that, at the time when he quit claimed the property to Ted and Shelly, he was on the verge of losing the property or was behind on the payments. He testified that he was still able to make the mortgage payments. He also testified that he was making a gift to the children; all they had to do was pay off the indebtedness of $30,000.

Ted Leaver was the plaintiffs' next witness. He rejected the characterization of the 2002 transfer of property as a gift. According to Ted, his father needed to get rid of the real property because he was three months behind on payments and in danger of foreclosure, and Ted helped his parents and the rest of the family by purchasing the property. Ted testified that Wanda could not participate in the purchase because she did not have good credit, and neither did Ted, so Shelly actually took out the initial loan. The plaintiffs' attorney read portions of Ted's deposition testimony wherein he discussed the 2002 meeting:

Q. . . . My question to you, beginning on line 19, page 16: "Was there ever – this is what I need to be fairly clear, what I'm confused about, was there ever up to and to the time he moved to Florida with your mother that he ever told you, I want you and Wanda to have an equal interest in this property [50/50]? Your answer: "He always told us he'd give us an acre a piece."

A. Correct.

Q. "Question: Did he ever say 50/50? Answer: Never had it documented 50/50 anywhere. Question: That wasn't my question. Answer: Yeah. Question: My question was did he ever tell you 50/50? Answer: He said he'd like both of us to have it, but when we purchased it, you know, they had the right to buy it but they said they couldn't."

Ted estimated that the real property was worth about $98,000 when he and his wife purchased it from Irvin and Linda Sue.

Ted denied that Irvin had ever stated he wanted Ted and Wanda to each have half of the real property. When asked about Irvin's testimony, Ted opined that Irvin was "mixed up" about some of the questions asked of him. He denied ever promising his father that half of the property would be given to Wanda and Kevin. Ted testified that the money he borrowed over the amount needed to pay off his parents' mortgage was used to pay off the Clayton mobile home and pay back property taxes. He and Shelly made the mortgage payments on

the property beginning in December 2002. According to Ted, Wanda and Kevin never approached him about paying part of the mortgage.

Ted testified that, when he and Shelly moved into the house in January 2005, Wanda approached him about purchasing the Clayton mobile home. Wanda and Kevin paid $4000 down and then began making monthly payments in accordance with the written agreement drafted by Shelly.

Ted acknowledged that, prior to selling the property to Brandon and Tammy, he had put the property up for sale but had only advertised four acres. When asked why he was only going to sell four acres, Ted stated: "Because I had a contract with my sister for two acres and that mobile home involved some paperwork . . . ."

Ted estimated that he and Shelly spent $40,000 to $50,000 on the house after they bought it.

The next witness, Wanda Leaver Williams, testified about her recollections of the 2002 family meeting called by Irvin and Linda Sue:

A. . . . My parents called this meeting together about the property because my father and mother were wanting to go to Florida and live, and they asked us about taking the property over – splitting the property for us to be taking it over. Until all of this come about [the lawsuit] is the first time I've ever heard anything about foreclosure. I've never heard by parents say anything about the property being behind.
. . . .

Q. What was your understanding of what you agreed to or what your dad said he wanted to do? Did he describe it correctly this morning?

A. It was supposed to be split between me and my brother. As far as assets and money and stuff like that, that was a place for us to live. We weren't supposed to have to move from that. As far as money and equity and that, when you're talking about family, you don't think about things like that. I thought about my brother and his family was going to be on the property. Me and my husband and my family was going to be on the property, like it was supposed to have been.
. . . .

Q. . . . When he [Irvin] made this announcement to you and your brother and your spouses, did you trust – have a good trusting relationship with your brother – and trust him completely.

A.  Yes, I did.

Q. . . . [W]hat is your recollection about the next significant event that happened with your mom and dad and you and your brother, with regard to the property?

A.  Well, the way I understood in the beginning there was a payment due on it.  I think it was like $500 a month.  The way I understood it is that me and my brother were going to be splitting that in half until it was paid off.  Well, my brother decided to go and get a loan.  My brother called me and told me that if you wanted to go through Cavalry Bank and that if we applied for the loan in his name and my name, say if my credit did not go through, then Cavalry Bank would not take the loan at all.  He couldn't just turn around and resubmit it.  He would have to go somewhere else, and he wanted to go through Cavalry Bank because that's where he did his banking.  And I told him, "Fine, he could go ahead and do" – as far as putting it in his name, and then we would split the payments every month.

Well, time went by, time went by, I asked and I asked.  The only kind of remark I ever got, which I did not speak with Shelly about this.  I always spoke with my brother, and my brother told me that Shelly would have to get that together.  That she had to sit down and figure it up.  I finally called my mother and I asked my mother, "Could you please find out what's going on?  We've paid nothing and I don't feel right about that."

Q. . . .  Before that time [when she was asking her mother about paying], were you aware that a closing had occurred where the property was titled in your brother's name?

A. . . .  As far as I knew, my brother was going to get the loan for the $36,000 to pay it off.  I never knew that more money was gotten from that. . . .

Wanda stated that she did not even know that her parents had transferred title to her brother until after the fact.  She never knew the amount that her brother borrowed.  Wanda testified that, despite her repeated inquiries, she never got an answer from Ted about how much she should be paying for her portion of the mortgage payment.

-7-

As to the agreement drafted by Shelly in 2009, Wanda testified that it was her understanding that her monthly payment to Ted and Shelly went toward their mortgage payments on the real property. She stated that, although she was originally supposed to get three acres of land, she was satisfied with the agreement to have two acres. She thought the remaining acre could provide a place for her parents to live if they returned from Florida.

Wanda admitted getting behind on her payments to Brandon and Tammy in August 2009. She stated that she went to their home in September and paid for August, September, and October. The next day, Tammy contacted her to say that Wanda would have to sign a lease agreement and pay $250 more a month in order to keep her mobile home on the property. Tammy then gave Wanda her money back. According to Wanda's calculations, she and Kevin had paid almost $16,000 on the mobile home at the time of the hearing.

Kevin Williams, Wanda's husband, was the last witness for the plaintiffs. Kevin and Wanda believed that Tammy and Brandon knew about the 2002 family meeting. Kevin mentioned to Brandon one day in 2009 that Wanda was concerned about her part of the property and Brandon assured him that everything would stay the same.

Shelly Leaver was the first witness for the defendants. Shelly testified that, at the time of the 2002 meeting, Irvin and Linda Sue were having trouble paying their mortgage. The available options were for Ted and Shelly or Wanda and Kevin to buy the property; otherwise, they would all have to move. Shelly borrowed the money, and the property was deeded to her and Ted. She denied that there was any agreement that they would buy the property for themselves as well as for Wanda and Kevin. She did not recall that Irvin had ever said, during the family meeting, that he wanted the two children and their spouses to split the payments on the property. According to Shelly, Irvin wanted both children to be able to stay there, but he left it open as to who was going to pay for the property. Shelly denied ever having any discussions with Wanda or Kevin about their making payments to Shelly and Ted for the property.

As to the 2009 written agreement she drafted, Shelly stated that the $30,000 was the price for Wanda and Kevin buying the mobile home and detached garage. Once the $30,000 was paid, Wanda and Kevin would also be given the two acres of property.

Ted Leaver was called to the witness stand again by the defendants. He testified that there was never any agreement that Wanda and her husband would pay anything towards the purchase of the property. Rather, he and Shelly bought the property for themselves and allowed Wanda and Kevin to live there.

Tammy Leaver, Brandon's wife, testified that, prior to the filing of the lawsuit, she never had any knowledge of a promise to give half of the real property to Wanda and Kevin. She was aware of the contract regarding Wanda and Kevin purchasing the Clayton mobile home. She testified that, prior to her filing an eviction notice against Wanda and Kevin, she had never heard anything from them about the fact that they were late on their monthly payments. The eviction notice was sent to them on September 18, 2009. Tammy took the position that, by failing to pay in August, Wanda and Kevin had voided the contract. Since Wanda and Kevin did not agree to pay an additional $250 a month, she returned the $900 payment (for three months) to Wanda.

Tammy testified that the payoff on the loan she and Brandon took out to buy the six acres was a little over $100,000 at the time of the hearing.

Wanda Leaver Williams testified on rebuttal. She reiterated her position that Brandon and Tammy knew about the 2002 agreement and gave examples of conversations she had with Tammy about the property.

*Trial court decision*

The trial court filed a memorandum opinion on May 12, 2010, in which it found that, "The evidence clearly preponderates in favor of a finding that the parents intended that the estate be held jointly so that all, or at least the brother and sister and their families, would reside on the property." The court concluded that the defendants "are holding two acres of land subject to an equitable constructive trust on the property." Because it found that appropriate relief could not be achieved through partition, the court ordered that the property be sold and the proceeds paid first to the mortgage holder. The remaining funds would be allocated as follows (in order of priority): $1000 to Brandon and Tammy Leaver for past due indebtedness on the mobile home purchase by Kevin and Wanda; $30,000 to Wanda Leaver (in recognition of the money received by Ted and Shelly for the sale of the house and taking into account their payment of the indebtedness and improvements to the property); and any remaining proceeds to be divided 1/3 to Wanda and Kevin Williams and 2/3 to Brandon and Tammy Leaver.

On June 11, 2010, the court entered its final order incorporating by reference the memorandum opinion. The court specifically set forth the following pertinent findings of fact:

(a) . . . [Irvin] and Linda Sue Leaver advised their children and their children's spouses that it was the intention of the parents for the children to share equally in the property. For the reasons outlined in the Memorandum Opinion [that

Shelly Leaver was in a position to obtain financing], legal title to the property was placed in the name of Ted Leaver and Shelly Leaver. Except for the expression of the grantor's intent that their children and their spouses share equally in the house and six-acre tract of land, there was no specific demarcation of boundaries or division of land specifically discussed, apparently under the theory that both children would retain an undivided equitable interest in the whole property.

(b) At the time the foregoing events occurred, a $36,000.00 debt was owed against the property and the property was worth approximately $110,000.00. Through a quit claim deed, legal title to the house and six acres became vested in the names of Ted Leaver and wife, Shelly Leaver, by tenants of the entirety. Wanda Leaver Williams and Kevin Williams were not noted on the deed as grantees or otherwise. Ted and Shelly Leaver immediately (contemporaneous with the quit claim transaction) secured an indebtedness against the property in the amount of $78,000.00, with that money used to discharge the $36,000.00 obligation owed by [Irvin] and Linda Sue Leaver, and to further pay off the indebtedness owed by Ted and Shelly Leaver on a certain mobile home which they owned, and which was located on the property.

(c) Under the terms of an inartfully drafted document, it appears that Ted and Shelly Leaver attempted to convey to Kevin and Wanda Williams the mobile home previously referenced, but in return for the Williams' payment to the Leavers the sum of $30,000.00 in installment payments.

(d) Incidental to a divorce proceeding between Ted and Shelly Leaver, the entirety of the six-acre tract of land, with all improvements, was conveyed to Brandon and Tammy Leaver, the son and daughter-in-law of Ted and Shelly Leaver. In the interim, Mr. and Mrs. Williams continued to occupy the mobile home, and made some payments thereon.

Based upon these findings, the court found that Wanda and Kevin were equitably entitled to two of the six acres and imposed a constructive trust on the property in favor of Wanda and Kevin for an undivided interest in the property equivalent to two acres or one-third of the property's value. The court found that Ted and Shelly had paid the $36,000 indebtedness and made some improvements on the land, and that Wanda and Kevin had repaid approximately $16,000 on the mobile home, leaving an indebtedness of $14,000 on "the oral agreement between the parties." The court went on to order that the property be sold and divided in accordance with the memorandum opinion.

A motion to alter or amend filed by the plaintiffs was denied in an order entered on July 27, 2010, and Brandon and Tammy Leaver have appealed. They present the following issues: (1) whether the trial court erred in imposing a constructive trust; (2) whether the trial court erred in finding that Brandon and Tammy Leaver were not bona fide purchasers; and (3) whether the trial court erred in its division of the proceeds of the proposed sale of the property.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999); *Story v. Lanier*, 166 S.W.3d 167, 183 (Tenn. Ct. App. 2004).

ANALYSIS

I.

The first issue for determination is whether the trial court erred in imposing a constructive trust.

A party asserting a constructive (or resulting) trust by parol evidence must prove the existence of the trust by clear and convincing evidence. *Story*, 166 S.W.3d at 184-85. A constructive trust is appropriate only "against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment or questionable means, has obtained an interest in property which he ought not in equity or in good conscience retain." *Id.* at 185 (quoting *Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 249 (Tenn. Ct. App 1992)). In the present case, the plaintiffs do not allege fraud or any form of deceptive or unconscionable conduct by Ted and Shelly Leaver or by Brandon and Tammy Leaver. We must conclude, therefore, that the trial court should not have imposed a constructive trust.

This conclusion does not, however, end the analysis. There is another equitable remedy, a resulting trust, that is available under the facts found by the trial court. The following principles, stated by our Supreme Court, are instructive:

> Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit

-11-

of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another–sometimes referred to as a "purchase-money resulting trust"–they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust–on an inquiry into the consideration of a transaction–in order to prevent a failure of justice.

*In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993). As a general rule, a resulting trust must arise "at the time of the purchase, attach to the title at that time and not arise out of any subsequent contract or transaction." *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980). Unlike constructive trusts, resulting trusts are generally "imposed in accordance with the actual or assumed intention of the parties." *Burleson v. McCrary*, 753 S.W.2d 349, 352-53 (Tenn. 1988).

In the present case, the chancellor specifically found that Irvin and Linda Sue Leaver intended for their children "to share equally in the property," but because Wanda and her husband did not have good credit and Shelly was able to obtain financing in her name, the property was deeded to Ted and Shelly. An unusual aspect of this case is that one of the original grantors, Irvin Leaver, was alive and able to testify at the hearing. He testified unequivocally that it was his intention that the children share the property equally, and that although he signed the quit claim deed giving the legal title to Ted and Shelly, he understood that his children, Ted and Wanda, would work things out so that they would each get their share of the property. The chancellor's findings indicate that he credited the testimony of Irvin and Wanda and rejected the contradictory testimony of Ted and Shelly. We give great weight to the chancellor's credibility determinations on appeal. *See Browder v. Hite*, 602 S.W.2d 489, 495 (Tenn. Ct. App. 1980).

We find clear and convincing evidence in this case to support the imposition of an equitable trust–namely, a resulting trust.

II.

The appellants next argue that they were bona fide purchasers of the property and not subject to any equitable trust.

-12-

We do not disagree with the premise that a bona fide purchaser (without notice and for value) takes property free of any resulting trust. *See Chadwell v. Wheless*, 74 Tenn. 312, 322 (Tenn. 1880); *see also* RESTATEMENT (SECOND) OF TRUSTS § 408 (1959); 76 AM. JUR. 2D *Trusts* § 135. The trial court's findings, however, do not support the appellants' argument. In its memorandum opinion, the trial court stated: "As to Brandon and Tammy Leaver, they bought with full knowledge of the obligation of Ted Leaver and Shelly Leaver to deed two acres to Wanda Williams and to Kevin Williams."

There was conflicting testimony as to what Brandon and Tammy knew about the conveyance to Ted and Shelly. The evidence does not preponderate against the trial court's finding that Brandon and Tammy had notice of the obligation of Ted and Shelly to convey two acres to Wanda and Kevin.

III.

The appellants, Brandon and Tammy, argue that the trial court's disposition of the sale proceeds fails to account for the $35,000 down payment they made when they bought the property from Ted and Shelly and, further, that the disposition leaves Ted and Shelly with an unfair share of the property's proceeds. Wanda and Kevin assert that the trial court acted within its discretion in its disposition of the property.

Although the original intent of Irvin and Linda Sue appears to have been to divide the land equally, Wanda and Kevin do not seek more than the two acres referenced in their agreement with Ted and Shelly. We will, therefore, adhere to the trial court's division pursuant to a 1/3 to 2/3 split.

The trial court found that the fair market value of the property was $150,000 and ordered the sale of the real estate, mobile homes, and other buildings and attached fixtures. We have already found clear and convincing evidence to support the imposition of a resulting trust and that the evidence does not preponderate against the trial court's finding that Brandon and Tammy had notice of the obligation of Ted and Shelly to convey two acres to Wanda and Kevin. Therefore, Brandon and Tammy took the property subject to Wanda and Kevin's interest

The trial court properly ordered that the proceeds of the sale be first applied to the costs of the sale and taxes, then to satisfy the security interest of Farm Credit Services of Mid-America. Since Brandon and Tammy took the property subject to Wanda and Kevin's interest, Wanda and Kevin's interest must be satisfied next. This is probably why the trial court's disposition of the sale proceeds did not account for the $35,000 down payment Brandon and Tammy made on the property. The trial court awarded Wanda and Kevin

$30,000, apparently taking into account improvements Ted and Shelly made to the property and money Wanda and Kevin owed to Brandon and Tammy. However, most of those improvements were to the house, which is part of the property now held by Brandon. We conclude that Wanda and Kevin should receive one-third of the gross proceeds of the sale (representing their ownership via the resulting trust of 2 of the 6 acres) minus one-third of the costs of the sale and taxes. The remaining proceeds should go to Brandon and Tammy.[1]

The only remaining issue is the agreement between Wanda and Kevin and Brandon and Tammy concerning the purchase of the mobile home. The trial court found that Wanda and Kevin owed $1000 for past due payments. We affirm that finding. Moreover, the trial court found that Wanda and Kevin had an "equitable obligation remaining of approximately $14,000.00 on the oral agreement between the parties," and that the debt was owed. We affirm that finding as well.

CONCLUSION

The judgment of the trial court is affirmed as modified. Costs of appeal are assessed one-half to the appellants and one-half to the appellees.

_____
ANDY D. BENNETT, JUDGE

---

[1] It may be that Brandon and Tammy have a claim against Ted and Shelly. However, as the trial court noted, "there is no third party action filed between these Defendants. Therefore, no judgment may be awarded here against Ted Leaver and Shelly Leaver in favor of Brandon Leaver and Tammy Leaver."

-14-