IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 24, 2014 Session

## RUTHERFORD WRESTLING CLUB, INC. V. ROBERT ARNOLD, ET AL.

**Appeal from the Circuit Court for Rutherford County**
**No. 61792     J. Mark Rogers, Judge**

---

**No. M2013-02348-COA-R3-CV – Filed April 30, 2015**

---

This appeal involves a dispute over the ownership of both real and personal property located at Blackman Middle School in Rutherford County, Tennessee between the appellant, Rutherford Wrestling Club, Inc., and the Appellees, consisting of Rutherford County, the Rutherford County Board of Education, and the Rutherford County Sheriff's Department. The trial court rejected various theories raised by the appellant regarding its claim of ownership of the property. After conducting a trial, the trial court concluded that the property belonged to the appellees. On appeal, the appellant claims that the trial court erred in finding that the appellant was merely a booster club and had no ownership interest in either the real or personal property in question. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ. joined.

W. Kennerly Burger, Murfreesboro, Tennessee, for the appellant, Rutherford Wrestling Club, Inc.

Blake A. Garner, Jeff Reed, and Thomas S. Santel, Jr. (at trial), Murfreesboro, Tennessee, for the appellees, Robert Arnold, in his official capacity as Rutherford County Sheriff; Rutherford County, Tennessee; and Rutherford County Board of Education.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

William C. Kennedy began working for the Rutherford County Sheriff's Office ("Sheriff's Office") during his last year of college. He started his career as a detention officer and was ultimately promoted to the rank of major in the course of his nineteen-year career with the Sheriff's Office. As a major, Mr. Kennedy's responsibilities included the management of all youth intervention programs, including all of the School Resource Officer ("SRO") Divisions in Rutherford County.

In 1995, in conjunction with the Sheriff's Office, Mr. Kennedy founded a youth intervention program known as the Sheriff's Athletic Fellowship & Enrichment or "S.A.F.E." program (also referred to as the "Keeping Kids S.A.F.E." program). Through the S.A.F.E. program, the Sheriff's Office organized, managed, and obtained funding for various youth outreach programs with which it was involved. Many of these programs were led by the SROs working under Mr. Kennedy. Some were led by third-party organizations in association with the Sheriff's Office. When Mr. Kennedy left the Sheriff's Office, over 52 programs were under the S.A.F.E. umbrella.

In 1998, Mr. Kennedy began a wrestling program under the auspices of the S.A.F.E. program. After outgrowing the original two locations, the program moved to Blackman Middle School and became known alternatively as the "Sheriff's Sharpshooters," the "Rutherford County Sheriff's Office Sheriff's Sharpshooters," or the "Sheriff's Sharp Shooters."

In June 2001, the wrestling program applied for and received a federal matching grant. In order to apply for the grant, the wrestling program had to apply through the Sheriff's Office. The money was used to purchase wrestling mats, shoes, wrestling singlets, headgear, warm-ups, and various other equipment, as well as insurance for the participants. The federal grant required that the funds be used to purchase property for the county. Mr. Kennedy prepared the grant application during work hours and used S.A.F.E. letterhead that also bore the Sheriff's Sharpshooter logo.

On June 19, 2001, Mr. Kennedy opened a checking account under the name "Rutherford Wrestling Club," which was the first known use of the Rutherford Wrestling Club (the "Club") moniker. On June 28, 2001, the Club obtained an Employer Identification Number. Both the checking account and the application for the EIN listed the address for the Club as the address of the Sheriff's Office. In 2002, Mr. Kennedy and the Club leadership began to consider seeking 501(c)(3) status.[1] On August 3, 2005, the

---

[1] 501(c)(3) status is recognition as an entity exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. 26 U.S.C.A. § 501(c)(3) (2011).

IRS issued a determination letter recognizing the Club's tax exempt status. However, the wrestling program continued to hold itself out to the public as the Sheriff's Sharpshooters.

The program continued to grow, and by early 2005, it had outgrown the Blackman Middle School cafeteria. Mr. Kennedy requested permission from Principal Butch Vaughn to construct a building on the Blackman Middle School campus to allow for more practice space. On March 21, 2005, Mr. Vaughn conveyed Mr. Kennedy's request to the Rutherford County Board of Education ("Board of Education"). The minutes of the Board of Education reflect the following agenda item and action:

> **6. Rutherford County Sheriff's Department Wrestling Club Building**
>
> Motion by Mr. Patton, seconded by Mr. Hodge, to approve the request from the *Rutherford County Sheriff's Department Wrestling Club* to construct a 60-foot by 100-foot metal building adjacent to the gym at Blackman Middle School. The Wrestling Club will be using the building for storage, practice and meetings. There will be no cost to the [Board of Education].

(emphasis added). Neither Mr. Kennedy nor any other member of the Club attended the Board of Education meeting.

Mr. Kennedy oversaw construction of the building on land owned by the Board of Education. Construction funds came from: fundraising events, such as wrestling tournaments, bake sales, dances, and oil changes; private donations; and Drug Enforcement Agency funds administered by the Sheriff's Office. Many of the parents involved with the wrestling program provided manual labor. The wrestling program began using the building in 2006.

On August 12, 2008, another proposal went before the Board of Education to add a bathroom facility to the building. The proposal identified the addition as the "Blackman Middle School Wrestling Building Restroom Facility." Once again, no representative of the Club attended the Board of Education meeting.

The Club continued to make use of the building without incident until the fall of 2010. In August 2010, the citizens of Rutherford County elected Robert Arnold as sheriff. On September 2, 2010, the day after assuming office, Sheriff Arnold informed Mr. Kennedy that, if he wished to remain with the Sheriff's Office, he would have to accept a reassignment. Rather than accept the reassignment, Mr. Kennedy resigned from the Sheriff's Office.

On October 29, 2010, Sheriff Arnold, accompanied by Sheriff's deputies and a group of inmates, removed wrestling mats, equipment, and other items from the wrestling program building. The officers accessed the building using a key obtained from the Blackman Middle School SRO, John Heath, who also served as vice-president of the Club. Although the parties dispute what was removed, Sheriff Arnold claimed to have returned everything to the building, with the exception of a copier, a DVR, and a box of records. The copier and DVR, both of which were labeled as Sheriff's Office property, were moved to the county jail and SRO Heath's office respectively. A sheriff's deputy apparently attempted to return the box of records to Mr. Kennedy, and when he refused to accept it, the box was left at Mr. Kennedy's feet.

Following the events of October 29, 2010, the Board of Education presented the Club with a Use of Facilities Form. The form authorized use of the building by the Club as a third party unassociated with Rutherford County. Mr. Kennedy refused to sign the form. As a consequence, the Rutherford County Director of Schools denied the Club access to the building.

On November 29, 2010, the Club filed suit in the Circuit Court for Rutherford County against Sheriff Arnold and Rutherford County. The complaint sought damages under the Tennessee Governmental Tort Liability Act ("TGTLA"), injunctive relief, mandamus, imposition of a resulting trust, and asserted various other claims. The Club later amended its complaint to add the Board of Education as a party. Following a hearing on December 14 and 15, 2010, the trial court denied the Club's request for a writ of mandamus and temporary and injunctive relief.

On June 28, 2013, the defendants filed a Motion for Judgment on the Pleadings, which was denied by the court just prior to trial. Trial took place over five days, July 9, through 12, 2013, and August 1, 2013. After completion of the Club's proof, the defendants moved for involuntary dismissal, which was also denied.

On September 10, 2013, the trial court entered an order dismissing the Club's claims. The court concluded that the Club was not the owner of the building or the personal property located therein. The court found instead that the wrestling building was owned by the Board of Education and that the contents of the building were owned by the Sheriff's Office. The trial court concluded that the Club's remaining claims were without merit.

## II. ANALYSIS

On appeal, the Club raises a number of issues, including: (1) whether the trial court erred in denying relief under the TGTLA for "negligent conversion"; (2) whether the Club has a cognizable claim under Tennessee Code Annotated § 40-17-118 (2012); (3) whether the Club is entitled to equitable relief through a resulting trust; (4) whether the Club is entitled to just compensation for a taking which failed to comply with the requirements of Tennessee Code Annotated § 29-16-107 (2012) and Article I, § 21 of the Tennessee Constitution; (5) whether mandamus is an applicable remedy to the failure of the Sheriff's Office to return confidential personal records of Club participants; and (6) whether the Club is entitled to damages based on the failure of the Sheriff's Office to obtain a detainer warrant under Tennessee Code Annotated § 29-18-101 (2012) before entering the wrestling program building on October 29, 2010.

In a civil case heard without a jury, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 414 (Tenn. 2013). When asked to review a trial court's determinations of witness credibility and the weight to be afforded particular testimony, we grant considerable deference to the trial judge who had the opportunity to observe the witnesses' demeanor and hear their in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)); *Saddler v. Saddler*, 59 S.W.3d 96, 101 (Tenn. Ct. App. 2000). Unlike an appellate court, trial courts are able to observe a witness's live testimony, assess their demeanor, and evaluate other indicators of credibility. Therefore, we will not overturn a trial court's assessment of credibility on appeal absent clear and convincing evidence to the contrary. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). We review questions of law de novo with no presumption of correctness. *Graham v. Caples*, 325 S.W.3d 578, 581 (Tenn. 2010); *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008) (citing *Perrin v. Gaylord Entm't Co.,* 120 S.W.3d 823, 826 (Tenn. 2003)).

### A. OWNERSHIP OF THE BUILDING AND PERSONAL PROPERTY

Most of the issues raised by the Club on appeal hinge on the trial court's determination that the Club did not have an ownership interest in the real or personal property at issue. The trial court made numerous factual findings relating to ownership of the wrestling building. The trial court found that the only express or written agreement concerning the building's ownership was the minutes of the Board of Education meeting held on March 21, 2005, in which the building was referred to as the "Rutherford County Sheriff's Department Wrestling Club Building."

Furthermore, the Club and its president, Mr. Kennedy, made several representations that the building was owned by someone other than the Club. In seeking grant money, Mr. Kennedy claimed the building was being constructed on behalf of the S.A.F.E. program, not the Club, and characterized the Club as merely a supporter contributing funds. The grant applications were sent on S.A.F.E. letterhead and bore the Sheriff's Sharpshooter logo. In one application, Mr. Kennedy stated:

> The Rutherford School Resource Officer Association is applying for the Richard Siegel Foundation Grant. The funds from this grant will go directly to the youth of Murfreesboro and Rutherford County through our Sheriff's Athletic Fellowship & Enrichment (S.A.F.E.) Program.
>
> . . . .
>
> The "Keeping Kids S.A.F.E." program started in 1995 with after school and summer mentoring to our youth through the YMCA's Y-SAFE officers. We have since expanded to include a S.A.F.E. Building that allows us to participate with our kids 365 days a year in recreational activities such as wrestling, fencing, martial arts, archery, power-lifting, and TWRA trap shooting. . . . We are having great success reaching a couple hundred kids a year and anticipate doubling our out-reach with the addition of our new building.
>
> We need funds to finish our S.A.F.E. building . . . .
>
> . . . .
>
> Our Current and previous major supporters include:
> - Rutherford County Conservation Board
> - Middle Tennessee Electric Customers Care Inc.
> - Music City Medical Co.
> - Affordable Drive Ways by Glenn Inc.
> - *Rutherford Wrestling Club*

(emphasis added).

In another grant application, Mr. Kennedy stated:

> We are now in the process of raising much needed funds to build a *SAFE building*. . . .
>
> . . . .

- 6 -

> Currently, we can only use borrowed facilities at the convenience of the principal or other coaches who have first priority a couple of days a week. . . .
>
> . . . .
>
> The *SAFE building* will be located at Blackman Middle School, behind the gym. It will be available for all of our Deputies to run their athletic programs out of year round.

(emphasis added).

Acknowledgment that the building was to be utilized by the S.A.F.E program is consistent with a number of checks written by Mr. Kennedy[2] on the Club banking account. The memo line on the checks reflected that the funds were being used for "SAFE Building," "Engineering for SAFE Building," "SAFE Building Blackman Middle," and "Safe Building Youth of Rutherford Co."

The Club's 2006 federal tax return stated that "Rutherford County owns the building we just raised the funds to have the building built." The Club's 2007 federal tax return also reflected that "[t]he Rutherford County Government owns the building and the land on which it sits." Although Mr. Kennedy and other representatives of the Club claimed that these statements were made in error, they acknowledged never seeking to correct the issue with the IRS. In deciding the ownership of the building, the trial court found this evidence "so compelling [that] this Court can neither ignore nor turn a blind eye" to its implications.

The Club's attorney introduced into evidence the records of the City of Murfreesboro Building and Codes Department pertaining to construction of the building. These permits did not identify the Club as the owner of the building. Rather, under the section for owner's name, the permits stated "Data Unavailable." However, a plumbing permit for the restroom addition to the building, signed by Mr. Kennedy, identified the Board of Education as the owner of the property. The commercial building permit issued for the restroom addition, also signed by Mr. Kennedy, identified the Board of Education as the owner as well.

Furthermore, the Club never paid any property taxes on the building or any of the utility bills, electric or water. Rutherford County or the Board of Education paid all utility expenses associated with the building.

---

[2] This checking account was set up by Mr. Kennedy prior to incorporation of Rutherford Wrestling Club, Inc. The account owner is listed as Rutherford Wrestling Club.

Based on these facts, the trial court found that the building was owned by "Rutherford County, Tennessee, and/or [the Board of Education]" and the Club was merely acting as a booster-club-type organization. As noted by the court, Board of Education policy and state law both dictated that anything placed on school property by donation vested in the school system. Under Board of Education policy in place at the time of construction, "all property contributed, given, or otherwise placed on school premises shall for all intents and purposes be a gift and become school system property subject to the same controls and regulations that govern the use of other school-owned property." Rutherford County Board of Education Policy 7-7, Gifts and Bequest (January 15, 2009); see also Tenn. Code Ann. § 49-6-2006 (2013) (authorizing the Board of Education to receive donations of money or property for any source and vesting title of such property with the Board). Harry Gill, the Rutherford County Director of Schools, testified that numerous other buildings have been constructed on Board of Education property by third party organizations with ownership vested in the Board of Education.

With regard to the personal property at issue, the trial court found that "the wrestling program, which started as a [S.A.F.E.] program in 1998, never changed ownership, either to the Rutherford Wrestling Club, or Plaintiff, Rutherford Wrestling Club, Inc." The court found that the wrestling program was always a program of the Sheriff's Office, and although the Club held a close relationship with the Sheriff's Sharpshooters, it never held itself out to the public as the owner of the wrestling program or its assets. To further bolster this finding, the court found that the Sheriff's Office logo was used on all of the wrestling program equipment, Sheriff's officers were paid comp time for their involvement with the program, and when anything was needed by the program, it was handled by an SRO. The court found "[n]o evidence . . . show[ing] that [the Club] ever conducted any fundraising activities, solicited grants, or advertised programs or activities, in its own name." Mr. Kennedy signed fundraising letters in his official capacity on S.A.F.E. letterhead that also bore the Sheriff's Sharpshooter logo..

The court ultimately concluded that the Club was a booster-club-type organization, and the funds it raised were spent on behalf of the Rutherford County Sheriff Department's Wrestling Club, or Sheriff's Sharpshooters. In the case of the federal grant monies, the grant guidelines required funds to be used to purchase property for the county. Therefore, the Club "retained no right of ownership or interest in any of the personal property in question, i.e. the contents of the building located on the campus of Blackman Middle School."

The Club argues that despite the court's findings, other facts support its claim to an ownership interest in the building and the personal property. For example, in addition to providing funds for the building and property, the Club maintained casualty insurance on the building. However, regardless of ownership of the building, the Club would have

an interest in maintaining insurance on the building as a sponsor. Furthermore, the Club's contribution of funds for the acquisition of the property at issue is consistent with its role as a booster club, as found by the trial court. The facts the Club relies upon are not inconsistent with the court's determination on ownership of the building and property.

Our review of the record leads us to the conclusion that the evidence does not preponderate against the trial court's findings[3] in regard to the ownership of the building and personal property. Because the Club failed to establish any interest in the property, the Club's claims for negligent conversion, damages under Tennessee Code Annotated § 40-17-118, and unlawful taking were properly dismissed by the court.

## B. RESULTING TRUST

Tennessee Code Annotated § 35-15-401 (2007) authorizes a court to create a resulting trust pursuant to its "statutory or equitable powers." Tenn. Code Ann. § 35-15-401(4). Our Supreme Court has explained the creation and application of a resulting trust as follows:

> The imposition of a resulting trust is an equitable remedy; the doctrine of resulting trust is invoked to prevent unjust enrichment. Such a trust is implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

---

[3] Whether the resolution of a dispute over ownership of property is a question of fact or law depends on the circumstances of the dispute. *See Ins. Co. of N.A. v. E. Tenn., V. & G. Ry. Co.*, 37 S.W. 225 (Tenn. 1896) (holding that where the facts require interpretation of a contract, ownership is a question of law); *Telfer v. Telfer*, No. M2012-COA-R3-CV, 2013 WL 3379370, *7 (Tenn. Ct. App. June 28, 2013) (holding that characterizing ownership of property as marital or separate is a factual question); *Gardner v. San Gabriel Valley Bank*, 93 P. 900, 902 (Cal. Ct. App. 1907) ("It is true that ownership may be pleaded and found as an ultimate fact, but it is equally true that it may be pleaded as a conclusion of law, and may be determined by the court as such a conclusion and not a fact."). In this particular case, ownership of the real and personal property involved can be resolved as a question of fact. Therefore, the trial court's findings are due a presumption of correctness, unless our de novo review indicates that the evidence preponderates otherwise. Tenn. R. App. P. 13(d).

While resulting trusts generally arise (1) on a failure of an express trust or the purpose of such a trust, or (2) on a conveyance to one person on a consideration from another—sometimes referred to as a "purchase-money resulting trust"—they may also be imposed in other circumstances, such that a court of equity, shaping its judgment in the most efficient form, will decree a resulting trust—on an inquiry into the consideration of a transaction—in order to prevent a failure of justice. However, the particular circumstances under which a resulting trust may arise varies from jurisdiction to jurisdiction.

*In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993) (quoting 76 Am. Jur. 2d *Trusts* § 166 (1992)).[4]

The equitable power to declare a resulting trust applies to both real and personal property. *Story v. Lanier*, 166 S.W.3d 167, 184 (Tenn. Ct. App. 2004); *Estate of Wardell ex rel. Wardell v. Dailey*, 674 S.W.2d 293, 295 (Tenn. Ct. App. 1983). Such a trust "'*must arise at the time of the purchase*, attach to the title at that time and not arise out of any subsequent contract or transaction.'" *In re Estate of Jones*, 183 S.W.3d 372, 379 (Tenn. Ct. App. 2005) (quoting *Livesay v. Keaton*, 611 S.W.2d 581, 584 (Tenn. Ct. App. 1980)). A resulting trust is typically proven by parol evidence. *Saddler*, 59 S.W.3d at 99. However, when a party seeks to prove such a trust through parol evidence, they bear

---

[4] *See also* Henry R. Gibson, *Gibson's Suits in Chancery* § 26.05 (William H. Inman ed., 8th ed. 2004):

Resulting trusts are those which arise where the legal estate is disposed of, without bad faith, and under such circumstances that Equity infers or assumes that the beneficial interest in said estate is not to go with the legal title. These trusts are sometimes called *presumptive* trusts, because the law presumes them to be intended by the parties from the nature and character of their transactions. They are, however, generally called *resulting* trusts, because the trust is the result which Equity attaches to the particular transaction.

Resulting trusts arise: (1) When property is conveyed, or devised, on some trust which fails, in whole or in part; (2) When land is conveyed to a stranger without any consideration, and without any use, or trust, declared; (3) Where the property is purchased and the title taken in the name of one person, but the purchase price is paid by another; and (4) Where the purchaser pays for the land but takes the title, in whole or in part, in the name of another.

A resulting trust will be decreed when necessary to prevent a failure of justice, and the equitable power to do so applies with respect to both real and personal property. It is generally proved by parol evidence, but the testimony must be clear and convincing. A mere preponderance is not enough.

(footnotes omitted).

the burden of doing so through clear and convincing evidence. *Story*, 166 S.W.3d at 184; *see also Estate of Queener v. Helton*, 119 S.W.3d 682, 686 (Tenn. Ct. App. 2003); *Saddler*, 59 S.W.3d at 99 ("In such a case, the proof of a resulting trust must be of the clearest, most convincing, and irrefragable character."). Testimony by a single interested witness is generally insufficient to carry this burden. *Saddler*, 59 S.W.3d at 99.

A resulting trust is generally established "where there is evidence that someone is 'holding' property that is in his or her name for the benefit of another, or where the beneficiary of the trust has paid money toward and/or worked toward property that is in someone else's name *with the agreement that the property would become the beneficiary's property*." *Estate of Queener*, 119 S.W.3d at 686-87 (emphasis added). Indeed, payment by one party creates a presumption of a trust in his favor, but such a presumption "may be rebutted by proof that a gift or loan was intended." *Walker v. Walker*, 2 Tenn. App. 279, 291 (Tenn. Ct. App. 1925).

The Club argues that, even if legal title to the building is vested in the Board of Education, the Club should be declared the beneficial owner of the property through a resulting trust. The Club points to its contributions of labor and funding as being indispensable to the construction of the building. As such, it claims entitlement to a beneficial ownership interest in the building through principles of equity.

However, the trial court found that the Club made these contributions in its role as a booster club, intending such expenditures to be a gift to the children of Rutherford County and the Board of Education. Furthermore, the trial court correctly noted a lack of evidence that the property would belong to the Club. The minutes of the March 21, 2005 Board of Education meeting indicated that the building was to be constructed by the "Rutherford County Sheriff's Department Wrestling Club," not the Club.

The trial court found that the Club failed to show, through clear and convincing evidence, that the Board of Education intended—or even knew of—any agreement for the Club to own a building on Board of Education land, much less that the parties intended for the Club to have beneficial ownership of the building. Instead, the court found that the Board of Education intended to give permission to another county entity, the Sheriff's Office, to construct the building at no cost to the Board. We conclude that the trial court correctly declined to establish a resulting trust in favor of the Club where the evidence was not clear and convincing that the parties intended for the Club to own the building.

C. MANDAMUS

A writ of mandamus is used to "coerce the performance of official duties" that only attaches "when there is no other specific remedy" available.[5] *Hayes v. Civil Serv. Comm'n of Metro. Gov't of Nashville*, 907 S.W.2d 826, 828 (Tenn. Ct. App. 1995). "A writ of mandamus is an extraordinary remedy that may be issued where a right has been clearly established and 'there is no other plain, adequate, and complete method of obtaining the relief to which one is entitled.'" *Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466, 479 (Tenn. 2004) (quoting *Meighan v. U.S. Sprint Commc'ns Co.*, 942 S.W.2d 476, 479 (Tenn. 1997)). Mandamus relief is only available for acts that are purely ministerial in nature. *Tusant v. City of Memphis*, 56 S.W.3d 10, 18 (Tenn. Ct. App. 2001). To determine whether an act is ministerial, the court must look to whether the law "defines the duties to be performed 'with such precision and certainty as to leave nothing to the exercise of judgment.'" *Id.* (quoting *Lamb v. State*, 338 S.W.2d 584, 586 (Tenn. 1960)). The party seeking mandamus bears the burden of proving that its right to issuance is clear and indisputable. *Fed. Deposit Ins. Corp. v. Ernst & Whinney*, 921 F.2d 83, 86 (6th Cir. 1990).

The Club claims that the trial court erred in refusing to issue a writ of mandamus requiring Sheriff Arnold to return the records of wrestling program participants seized during the October 29, 2010 search of the building. However, the Club fails to cite any authority setting forth the duties of Sheriff Arnold to act in compliance with the requested relief. Even had it done so, the Club offered no proof that Sheriff Arnold's duty to return the records was ministerial in nature. Furthermore, the court found that the Sheriff's Office did attempt to return the records to Mr. Kennedy, and when he refused to accept them, the records were left in his care.

D. UNLAWFUL DETAINER

"Unlawful detainer occurs when the tenant enters by contract, either as 'tenant or as assignee of a tenant, or as personal representative of a tenant, or as subtenant, or by collusion with a tenant, and, in either case, willfully and without force, holds over possession from the landlord, or the assignee of the remainder or reversion.'" *Johnson v. Hopkins*, 432 S.W.3d 840, 844 (Tenn. 2013) (quoting Tenn. Code Ann. § 29-18-104). An action for unlawful detainer may resolve possessory interests only, not the merits of title. *Id.* at 845. The legislative intent behind the statute is to create a "streamlined, inexpensive, summary procedure to determine the rights to possession of land, in contrast to the old formal common law ejectment action." *CitiFinancial Mortg. Co. v. Beasley*, No. W2006-00386-COA-R3-CV, 2007 WL 77289, at *5 (Tenn. Ct. App. Jan. 11, 2007). By requiring the party seeking to repossess property to enlist the aid of the court, these

---

[5] Circuit and chancery courts have the power to issue writs of mandamus. Tenn. Code Ann. § 29-25-101 (2012).

proceedings help prevent violence and breaches of the peace caused by repossession through self-help. *Id.*

The Club contends that it was at the very least a tenant at-will of the building. As tenants, the Club argues that the Appellees could not eject them from the building without resort to court process or legal authority. Under Tennessee Code Annotated § 29-18-101: "No person shall enter upon any lands, tenements, or other possessions, and detain or hold the same, but where entry is given by law, and then only in a peaceable manner." Tenn. Code Ann. § 29-18-101.

The Club's argument must fail because there is no evidence of a leasehold interest in the building. The trial court found that the wrestling program located at Blackman Middle School was conducted by the Sheriff's Office, not the Club and that the Club was merely a booster club aiding a program of the Sheriff's Office. Furthermore, school grounds are routinely open to public use, but the public does not gain an ownership or tenancy interest in such facilities merely because they are allowed to use them. *See Rutherford County v. City of Murfreesboro*, 309 S.W.2d 778, 787 (Tenn. Ct. App. 1957) (holding that permissive use of land owned by Rutherford County by the City of Murfreesboro did not create an ownership interest in the City). For these reasons, the Club's claims based upon Tennessee Code Annotated § 29-18-101 are without merit and were properly dismissed.

### III. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
W. NEAL McBRAYER, JUDGE

- 13 -